■ Therefore, for the reasons stated above, this Court holds that a classified civil service employee who is suspended from his employment for thirty days or less is not entitled to an appeal to the West Virginia Civil Service Commission. *W.Va. Code,* 29–6–15 [1977].[4]

Affirmed.

294 S.E.2d 142

**STATE of West Virginia ex rel. J. L. K.**

v.

**R. A. I., II.**

**No. CC932.**

Supreme Court of Appeals of West Virginia.

July 2, 1982.

---

Allen, Cline & Forbes and William C. Forbes, Charleston, for plaintiff.

Timothy N. Barber, Charleston, for defendant.

McHUGH, Justice:

This action is before this Court upon a certified question from the Circuit Court of Kanawha County, West Virginia. The certified question involves the right of J.L.K. to accuse the defendant, R.A.I., II, of being the father of her children. This Court has before it the order of the circuit court entered May 1, 1980, by which order the question was certified, all matters of record and the briefs and argument of counsel.

A magistrate issued two warrants against the defendant, one warrant (M–78–832) related to the birth of J.L.K. and another warrant (M–78–831) related to the birth of M.G.K.[1] Pursuant to *W. Va. Code*, 48–7–1 [1969], the actions were then docketed before the Circuit Court of Kanawha County as Action No. AP–CRS–78–113 and Action No. AP–CRS–78–112, respectively.

By order entered on May 1, 1980, the trial court certified the following question to this Court:

> Whether a woman has a right under West Virginia Law to bring a bastardy action as an unmarried woman where she delivers a child while unmarried but said child was conceived during a lawful mar-

---

1. The brief filed in this Court on behalf of the appellant indicates that M.G.K. died on March 15, 1980.

riage and said marriage was dissolved prior to the birth of the child, said child being born within less than one year of the last date of known cohabitation with her then husband.

The central issue is the interpretation of *W.Va.Code*, 48–7–1 [1969], which reads, in part:

> If a married woman live separate and apart from her husband for the space of one year or more, and shall not at any time during such separation, cohabit with such husband she may, if she be delivered of a child at any time after such one year, and while such separation continues, accuse any person, other than her husband, of being the father of such child, in like manner, and the same proceedings shall thereupon be had, as if she were an unmarried woman.

However, three arguments are presented by J.L.K. First, the one-year requirement is an arbitrary rule which discriminates against illegitimate children, thus her child is "forever barred from the right to support, maintenance, inheritance and her father's good name." Second, the statute in question violates the equal protection clauses of both the State and Federal Constitutions. Finally, J.L.K. argues that, if *W.Va. Code*, 48–7–1 [1969], is held valid, her marital status at the time of birth of her child should be controlling. If so, her status as an unmarried woman applies and she would not be barred by the one-year separation requirement.

The facts in this action are not in dispute. On June 30, 1972, the appellant married S.B.K. On November 25, 1975, J.L.K. and S.B.K. began living separate and apart. On April 9, 1976, they were divorced.

Since that divorce, the appellant has remained unmarried. On November 23, 1976, the appellant gave birth to twin children, J.L.K. and M.G.K.

Originally *W.Va.Code*, 48–7–1 [1969][2] merely codified the common law which allowed only an unmarried woman the right to bring a paternity action against the putative father. However, the West Virginia Legislature in Chapter 80 of the Code of 1868 amended the statute to enable a married woman, if the child was born one year or more after the mother and her husband began living separate and apart, to bring a paternity action as if she were an unmarried woman.

At common law a child born or conceived during marriage was conclusively presumed to be legitimate. *Ray v. Ray*, 219 N.C. 217, 13 S.E.2d 224 (1941). The rule was recognized and applied in *State v. Reed*, 107 W.Va. 563, 149 S.E. 669 (1929), which quoted Lord Mansfield in the case of *Goodright v. Moss*, 2 Cowp. 591, 98 Eng. Reprints, 1257 (1777):

> As to the time of the birth, the father and mother are the most proper witnesses to prove it. But it is a rule, founded in decency, morality, and policy, that they shall not be permitted to say after marriage, that they have had no connection, and therefore that the offspring is spurious; more especially, the mother, who is the offending party.

149 S.E. at 671.

The basis of the presumption "recognizes the legal burden and social stigma cast upon an innocent child when he is bastardized, as well as the responsibilities of two persons who have entered the state of mar-

**2.** The history of *W.Va.Code*, 48–7–1 [1969] is interesting. It was originally enacted as *Va. Code*, 35–125–1 [1849]. Upon gaining statehood the Virginia statute was adopted in West Virginia. In 1868 the West Virginia legislature added the married woman provision, while in 1875 the Virginia General Assembly in Va. Acts of Assembly c.112, p. 94, repealed its statute entirely. Presently *Va.Code*, 20–61.1 [1982] allows a paternity action against a man not married to the mother. Virginia has not specifically codified under what circumstances a married woman may bring such an action. Instead, Virginia relies upon a combination of case law which presumes legitimacy, with the presumption being rebuttable, and *Va.Code*, 20–61.1 [1982]. *See generally Cassady v. Martin*, 220 Va. 1093, 266 S.E.2d 104 (1980); *Brown v. Com. ex. rel. Custis*, 218 Va. 40, 235 S.E.2d 325 (1977). Although Virginia's presumption of legitimacy is a rebuttable one, once it has been rebutted, the mother then must meet the strict requirements of *Va.Code*, 20–61.1 [1982] before paternity against another man can be proven. In fact, the requirement by the Virginia statute is so strict that virtually nothing less than an admission of paternity by the putative father can be introduced as evidence against him.

riage." *State ex rel. Satterfield v. Sullivan,* 115 Ohio App. 347, 185 N.E.2d 47, 49 (1962). The common law "presumption was so absolute that the doctrine of *filiato non potest probaris* [3] applied, and no proofs would be received to dispute the legitimacy of the child." *Powell v. State,* 84 Ohio St. 165, 95 N.E. 660, 661 (1911), *overruled on other grounds, State ex rel. Walker v. Clark,* 144 Ohio St. 305, 58 N.E.2d 773 (1944). The policy behind such a rationale is referred to in the often cited case of *Powell v. State, supra:*

> Public policy requires that the status of a child born or begotten in lawful wedlock should be fixed and certain, and the immediate exigencies or even the apparent justice of any particular case will not justify a departure from the rule so necessary and salutary to the best interests of society. The law is not willing that a child shall be declared a bastard to suit the whims or purposes of either parent....

95 N.E. at 662.

The only defenses available to the husband at common law were impotency or that he was beyond the four seas. *Ray v. Ray, supra.* This reasoning is most ably expressed in *Milone v. Milone,* 290 N.Y.S. 863, 160 Misc. 830 (1936):

> The child should not be punished for the misconduct of either its mother or its father ... whether the lawful husband or the paramour was the father of the child, resulting in a mark of illegitimacy

to be stamped upon the child, would evidently be unjust to the child and contrary to public policy.

290 N.Y.S. at 867.

The common law rule can thus be viewed as a protective device for both the child and mother so that the label "bastard" would not stigmatize the child, nor would the mother's reputation be tarnished. Moreover, the common law rule upheld the integrity of the family because it was the family which was the basic social and economic fabric which bound society together.

However, as society became more industrialized, and thus fragmented, the family's importance as a unifying entity diminished. In response to this development, state legislatures altered the common law of illegitimacy. As a result of such changes many barriers were lifted, e.g., illegitimate children could rightfully inherit from their fathers. *See W.Va.Code,* 42–1–5 [1931] and *Adkins v. McEldowney,* 167 W.Va. 469, 280 S.E.2d 231 (1981). West Virginia, as evidenced by *W.Va.Code,* 48–7–1 [1969], is no different in this respect.

West Virginia is not alone in changing the common law in regard to allegations of paternity. Other legislatures such as California,[4] Louisiana,[5] Oklahoma,[6] North Dakota,[7] and New York,[8] have also enacted statutes which deem children born within a certain time period after the dissolution of a marriage to be legitimate, thus preclud-

---

**3.** *Filiato non potest probari[s]* means that a married woman could not bring an action accusing a man not her husband as being the father of her child. *Ballentine's Law Dictionary* 502 (2d ed. 1948).

**4.** *Cal.Ann.Evid.Code* § 621 [West 1981] provides that "the issue of a wife cohabitating with her husband, who is not impotent or sterile, is conclusively presumed to be a child of the marriage." This section has been interpreted to also include conception during cohabitation as well. *Louis v. Louis,* 7 Cal.App.3d 851, 86 Cal.Rptr. 834 (1970). Pursuant to *Cal.Ann.Evid.Code* § 621(b) and (c) [West 1981], the husband may use blood tests as rebuttal evidence to the conclusive presumption. It should also be noted that until its effective repeal in 1967, California Civil Code § 193 [1901] deemed a child born within ten months of divorce to be legitimate.

**5.** *LSA–C.C. art.* 184 [West 1976]: "The husband of the mother is presumed to be the father of all children born or conceived during the marriage." *LSA–C.C. art.* 185 [West 1976]: "A child born less than three hundred days after the dissolution of the marriage is presumed to have been conceived during the marriage."

**6.** *10 Okl.St.Ann.* § 2 [West 1921]: "All children of a woman who has been married, born within ten months after the dissolution of the marriage are presumed to be legitimate children of that marriage."

**7.** *N.D.Cent.Code* § 14–09–02 [1943] reads the same as *10 Okla.St.Ann.* § 2 [West 1921].

**8.** *N.Y. Domestic Relations Law* § 175 [McKinney 1962] is similar to the aforementioned statutes.

ing the mother from accusing someone other than her former husband of paternity.

Three differences, however, do exist between the statutes in those states and the statute in West Virginia. First, those states require a time period of ten months instead of one year. Second, the time period in those states starts running from the date of divorce or legal separation, instead of the initial date of living separate and apart. Finally, a strong, yet rebuttable, presumption has been created in those states in lieu of an absolute one, except for nonaccess, as in West Virginia.

The first difference between West Virginia and the other states concerns the time period. The normal gestation period is, of course, nine months. It is common, however, for a pregnancy to last ten months. R. Benson, *Handbook of Obstetrics and Gynecology* 52 (6th ed. 1977). Thus, it is apparent that the states which adhere to the ten-month requirement follow the rule that a common gestation period may be ten months. However, pregnancies are on record as lasting much longer. In Ohio and Kentucky pregnancies which lasted 324 days were found to exist, and the children thus born were held to be legitimate. *Powell v. State, supra; Ousley v. Ousley*, 261 S.W.2d 817 (Ky.1953). In Washington a gestation period of 336 days occurred. *Pierson v. Pierson*, 124 Wash. 319, 214 P. 159 (1923). Furthermore, it is possible for a pregnancy to last up to 389 days. R. Benson, *supra*, at 52.

■ In West Virginia a child either born or conceived during marriage is a legitimate child. *Worley v. Lavender*, 147 W.Va. 803, 809, 131 S.E.2d 752, 756 (1963).[9] It is easy to determine when a child is born, we merely look to the date of birth. Determining the date of conception is not so exact. One cannot merely count back nine, or ten, months from the date of birth and arrive at the time of conception. Any such computation would be a mere approximation, nothing more.

■ It can, therefore, be readily assumed that the one-year statutory requirement is a compromise between the common law doctrine and a recognition of medical possibilities. The additional two months which the West Virginia statute requires can be properly viewed as a margin of safety regarding the conception date. *W.Va.Code*, 48–7–1 [1969] protects the interests of the child in statutorily deeming the child legitimate. It is to provide the child with a legal father without the uncertainty of a proceeding to establish paternity. Given the medical possibilities, human frailties, and the common law rule, the child is given the benefit of the doubt, so to speak, of legitimacy. We do not find that the one-year period is unreasonable in light of the interests to be protected. Thus, in response to the appellant's first argument, we find that the one-year separation requirement is not an arbitrary rule. Nor does the requirement bar her child from "the right to support, maintenance, inheritance and her father's good name."

The second difference concerns the time at which the separation begins. West Virginia's date of voluntary separation is much more logical than the date of legal separation or divorce, as required by the other states. However, because this is not an issue in the present certified question, it need not be discussed further.

It is the third difference concerning West Virginia's conclusive presumption of legitimacy and the other states' rebuttable presumptions which is the most problematic. Any law arises from the cultural needs and desires of the people which enact it. In West Virginia we continue to be influenced by our high regard for the family. We view the family as a loving and nurturing force in which each member is able to have physical and psychological needs met, thus allowing father, mother and children alike to grow and prosper. In order to promote harmony within the family and discourage actions which interfere with that harmony,

---

**9.** This is a presumption which may be rebutted, but only if "the nonaccess of her husband ... [is] clearly and satisfactorily proved." Syllabus point 4, *State v. Reed*, 107 W.Va. 563, 149 S.E. 669 (1929). This burden of proof by the *husband* is similar to the common law rebuttal evidence of "impotency or beyond the four seas."

the legislature has chosen to alter the common law of illegitimacy only to the extent that before a married woman can accuse a person other than her husband of being the child's father she must have lived separate and apart from her husband for a space of one year or more prior to the birth of the child.

While the stigma of illegitimacy has lessened, the law favors legitimacy. *State v. White*, 300 N.C. 494, 508, 268 S.E.2d 481, 490 (1980). The West Virginia statute was amended to protect the interests of the child, conferring upon him a right, i.e. legitimacy, which the other state statutes do not.

■ This Court has often held that the purpose of *W. Va. Code*, 48–7–1 [1969] is to prevent an illegitimate child from becoming a charge upon the State. *State ex rel. Crouser v. Mercer*, 141 W.Va. 691, 92 S.E.2d 745 (1956), *overruled on other grounds, Kinsey v. Kinsey*, 143 W.Va. 574, 103 S.E.2d 409 (1958). If the husband is conclusively presumed to be the father, the child will not become a charge of the State. Thus, after balancing the interests of all persons involved, we cannot say that the legislature did not have a reasonable basis, nor acted arbitrarily, in its enactment of *W. Va. Code*, 48–7–1 [1969].

■ The appellant's second argument is that the West Virginia statute denies her child equal protection of the law and violates the equal protection guarantee of the Fourteenth Amendment to the United States Constitution, and Article III, Section 1, of the West Virginia Constitution. She contends that it divides illegitimate children into two classes, one which can receive support and one which cannot, which was held impermissible in *State ex rel. S. M. B. v. D. A. P.*, 168 W.Va. 455, 284 S.E.2d 912 (1981).

In *State ex rel. S. M. B. v. D. A. P., supra*, this Court held the three-year limitation of actions to establish paternity established by *W. Va. Code*, 48–7–1 [1969] unconstitutional on the ground that it circumscribed an illegitimate child's right to establish his putative father's obligation of support. The three-year limitation prevented an illegitimate child from both having a legal father named and support thus derived from him unless the mother commenced a paternity action within three years of the child's birth. This created two classes of illegitimate children: one which could establish paternity and thus receive support and one which could not. This Court held that the three-year limitation bore no substantial relationship to a permissible State interest.

J. L. K. asserts that such a division into two classes of illegitimate children exists in her circumstances. The appellant assumes that her child is illegitimate and that the statute in question precludes her from having a father named. Thus, appellant approaches the statute as taking away certain rights which other mothers have, e.g., the ability to receive support for her child. Her assumptions are erroneous because *W. Va. Code*, 48–7–1 [1969] conclusively presumes that a child born within that one-year period is legitimate and entitled to support from the man to whom the appellant was married. Thus no two classes of illegitimate children can be said to exist.

This Court has found only one other case, *Gammon v. Cobb*, 335 So.2d 261 (Fla. 1976), which has held such a statute unconstitutional. The facts in *Gammon, supra*, were that the mother and husband, whose whereabouts were unknown, had not resided together for a period of twenty years. During those twenty years she had cohabited with the defendant as man and wife and the couple were delivered of seven children. The statute under scrutiny was Section 742.011, Florida Statutes (1975), which provided: "Any unmarried woman who shall be pregnant or delivered of a bastard child may bring proceedings . . . to determine the paternity of such child." Because the Florida statute prevented a married woman under any circumstances from bringing such an action, the Florida court held that the children were denied equal protection of the law. 335 So.2d at 267.

However, several distinguishing factors exist between *Gammon, supra*, and *W. Va. Code*, 48–7–1 [1969]. First, the Florida statute prohibited all married women, regardless of circumstances, from filing a

paternity suit. The West Virginia statute does not. Second, the Florida statute was being used to deny the children the support which was the very reason for the statute's existence. 335 So.2d at 266. Thus, the welfare of the children demanded that the court recognize and honor the underlying purpose of the statute. This condition does not exist in West Virginia. The West Virginia statute cannot be used to deny a child support because it conclusively presumes a child born within that one-year period to be a legitimate child of the mother's husband. Finally, the Florida Court demonstrated inconsistencies between *Fla.Stat.* § 742.011 (1975) and other Florida statutes which, in effect, permitted other illegitimate children in other statutory classifications to receive support from their natural fathers irrespective of the marital status of the mother.[10] Statutory inconsistencies divided illegitimate children into classes which prevented some children from gaining support from their natural fathers, while allowing support to others. Thus, it is readily apparent that the addition of the last sentence in 1868 to the West Virginia statute, which enables a married woman to bring a paternity suit, will not result in the dilemma which was faced by the appellant in *Gammon, supra.*

Because we are of the opinion that the one-year requirement in *W.Va.Code*, 48–7–1 [1969], is not arbitrary nor does it violate J.L.K.'s constitutional rights, we must now respond to appellant's final argument that her marital status at the time of the birth of her child should control. The

appellant was married at the time of conception, yet unmarried when the child was born. If she is deemed a married woman, she will be precluded from pursuing her action. If, however, she is classified as an unmarried woman, she would be able to obtain the warrant alleging the paternity of R.A.I, II. Thus, our inquiry focuses on the issue at what point the marriage restriction of *W.Va.Code*, 48–7–1 [1969] applies, i.e., conception, birth, both conception and birth, or filing of complaint.

The appellant relies heavily on *State ex rel. Crouser v. Mercer, supra,* which held that the one-year period of separation as required by *W.Va.Code*, 48–7–1 [1931][11] did "not apply to a woman who is unmarried at and prior to the birth of a child of which she is delivered." 141 W.Va. 707, 92 S.E.2d at 754. The facts indicate that the appellant in *State ex rel. Crouser v. Mercer, supra,* was both unmarried at time of conception and birth but was married when she filed the complaint. The defendant argued that because the appellant was married when she filed the complaint, she should be precluded from bringing the action. The Court found this argument to be without merit and to be contrary to the main purpose of the statute which was, and still is, "to prevent an illegitimate child from becoming a charge upon the county and to compel the father to bear the burden of its maintenance and support, to the relief of the State and the public." 141 W.Va. at 705, 92 S.E.2d at 753.

10. The Florida Court noted the following classifications:

a) a child of an unmarried woman under the provisions of Chapter 742, Florida Statutes;

b) a child whose father has acknowledged paternity in writing before a judge in the juvenile division of the circuit court, without regard to the marital status of the mother, pursuant to § 39.11(2)(e), Florida Statutes;

c) a child whose paternity has been adjudicated in a foreign jurisdiction, by whatever procedure or whatever evidence may be proper there, without regard to the restrictions on such procedure in Florida, pursuant to subsection 856.04(2), Florida Statutes;

d) vicariously under sub-section 440.02(13), Florida Statutes, the Workmen's Compensa-

tion Act, where the child has been 'acknowledged' even by circumstantial evidence, by the father;

e) vicariously through damages for wrongful death where the natural father 'has recognized a responsibility for the child's support' pursuant to sub-section 768.18(1), Florida Statutes; and

f) where the natural father marries the mother subsequent to divorce from the man to whom she was legally married at the time the child was conceived. *Sacks v. Sacks,* [267 So.2d 73 (Fla.1973)].
335 So.2d at 267.

11. The provision regarding married women as per the 1931 *Code* is the same as the present provision.

While some cases in other jurisdictions [12] hold that time of conception is controlling we disagree with that position. We believe that approach is too unstable because of the difficulty in determining the time of conception. It would be too tenuous a premise upon which to anchor any steady standard of law. To hold that time of conception alone controlled could mean that a premature birth of any recently married couple could result in a paternity action. That approach is also inconsistent with *L. A. M. v. M. L. M.*, 162 W.Va. 273, 250 S.E.2d 40 (1978) which held that, "[i]n light of the longstanding, unfettered existence of the presumption in this jurisdiction and the overwhelming force of unanimous precedents from others, we hold that the presumption of legitimacy arises from birth in wedlock...." 162 W.Va. at 277, 250 S.E.2d at 43.

In the case now before the Court, J.L.K. asserts that her marital status at the time of birth alone should control. While the facts in *State ex rel. Crouser v. Mercer, supra,* are distinguishable from the certified question before us, it does offer some guidance to our present analysis. *State ex rel. Crouser v. Mercer, supra,* reaffirmed the long acknowledged purpose of then *W. Va. Code,* 48–7–1 [1931] which was "to prevent an illegitimate child from becoming a charge upon the county and to compel the father to bear the burden of its maintenance and support, to the relief of the State and the public." 141 W.Va. at 705, 92 S.E.2d at 753. Furthermore, the statute "should be construed liberally to effectuate its purpose." 141 W.Va. at 705, 92 S.E.2d at 753.

As we noted above, *W. Va. Code,* 48–7–1 [1969] presupposes the existence of an illegitimate child before a paternity action can be made in accordance with the statute. In the circumstances before us, J.L.K.'s child is conclusively presumed to be legitimate.

She has the right to maintenance and support from her father, J.L.K.'s former husband, subject to his common law rights.[13] To hold that her marital status at the time of birth alone should control would mean that a child born even one day after a divorce, regardless of the last date of cohabitation of the husband and wife, would be deemed illegitimate. This conclusion would require a mother to prove paternity, even against her former husband, before the child could receive support. This would not be consistent with the liberal construction requirement of *W. Va. Code,* 48–7–1 [1969].

Moreover, *State ex rel. Crouser v. Mercer, supra,* held that a woman must be "unmarried at and prior to the birth" of the child before she can be viewed as an unmarried woman for purposes of the statute. 92 S.E.2d at 754. If the phrase "and prior to the birth" has any meaning, as defendant in this action asserts, it must pertain to the date of conception.

■ For the reasons stated in this opinion, this Court holds that a woman, who conceived a child while she was married, but gave birth to the child while she was unmarried, may not obtain a warrant, pursuant to *W. Va. Code,* 48–7–1 [1969], accusing a person other than her former husband of being the father of the child if she has not lived separate and apart from her former husband for a space of one year or more prior to the birth of the child.

Certified Question Answered in the Negative.

---

12. *See, e.g., Green v. Commonwealth ex rel. Helms,* 297 Ky. 675, 180 S.W.2d 865 (1944). *See generally* Annot., 98 A.L.R.2d 256, 264 (1964); Annot., 53 A.L.R.2d 572 (1957).

13. This Court recognizes the dilemma which a mother may find herself if her husband, by using one of the common law defenses, is able to prove that he is not the father of the child. Our interpretation of *W. Va. Code,* 48–7–1 [1969]

is derived from the language of the statute itself. Other state legislatures, *see* nn. 4–8, *supra,* and accompanying text, have found it desirable to allow a mother, once her husband has proven that he is not the father of her child, to accuse another person. The present West Virginia statute makes no such allowance. The legislature, however, may well view this area as an appropriate matter for legislative consideration.