387 S.E.2d 866

**MICHAEL K.T.**

v.

**TINA L.T.**

No. 18989.

Supreme Court of Appeals of
West Virginia.

Dec. 21, 1989.

Richard A. Bush, Bush & Trippel, Parkersburg, for Michael K.T.

David McMahon, West Virginia Legal Services Plan, Inc., Charleston, for Tina L.T.

WORKMAN, Justice:

This case is before the Court on an appeal from a final order of divorce which declared the appellant, Michael K.T. (Michael T.), to be the father of the child born during the appellant's marriage to the appellee, Tina L.T. (Tina T.), despite conclusive blood test evidence to the contrary and required appellant to pay monthly child support until the child reaches the age of majority. This appeal presents a case of first impression regarding whether blood test evidence is admissible for the purpose of rebutting the presumption of legitimacy

that arises when a child is conceived or born during a marriage.[1]

The facts giving rise to this appeal are as follows: The parties were married in Wood County, West Virginia, on November 1, 1983. One child, namely Brittany N.T. (Brittany T.), was born on June 5, 1985. The parties last lived together as husband and wife on July 26, 1986. Appellant filed a complaint against Tina T. on August 10, 1987, wherein he sought a divorce upon the grounds of irreconcilable differences, one-year separation, cruel and inhuman treatment, and adultery. Based on his allegation that Brittany T. was not his child, appellant also sought a determination from the court that no children had issued as a result of the marriage.

During the course of the final hearing before the family law master, evidence pertaining to two separate blood tests was admitted for the purpose of resolving the paternity of Brittany T.[2] These tests conclusively demonstrated that Michael T. could not be the biological father of Brittany T.[3] Following the conclusion of the final hearing, the family law master made the following finding of fact in connection with his recommended decision:

> The child, Brittany [T.] was born June 5, 1985 to the defendant, Tina [T.]. However, two separate blood tests taken during these proceedings absolutely preclude the Plaintiff from being the natural father of the child, Brittany [T.]. In

addition, the evidence showed that at the time of the conception of the child, Brittany [T.], the Plaintiff had non-access to his wife in that he was on military maneuvers in the Federal Republic of Germany. The Defendant admitted that during the time her husband was absent on military exercise that she had sexual intercourse with one Brett [P.]. Therefore, the overwhelming weight of the evidence was that the plaintiff is not the father of Brittany [T.].

The family law master concluded as a matter of law "[t]hat the plaintiff, Michael [T.], is not the father of Brittany [T.] and therefore he does not have any legal rights or obligations regarding said child."

The circuit court granted the divorce on the grounds of irreconcilable differences, but refused to follow the recommended decision of the family law master with respect to declaring that Michael T. was not the father of Brittany T. Instead, the court ordered that Brittany T. be declared the legitimate child of the appellant and further directed that Michael T. was required to pay the monthly sum of $345.00 for child support and maintenance. In deciding that Brittany T. was the legitimate child of the appellant, the circuit court found determinative the fact that the conditions precedent for establishing paternity pursuant to W.Va.Code § 48A–6–1 (Supp. 1989) had not been met.[4]

1. Although we recognized this issue as one of first impression in *State ex rel. Oldaker v. Fury*, 173 W.Va. 428, 317 S.E.2d 513 (1984), the procedural immaturity of that case precluded us from addressing the issue on its merit. *Id.* 173 W.Va. at 430, 317 S.E.2d at 516.

2. The first blood test was performed upon appellant's motion. As support for his motion, Michael T. stated that he had significant reason to believe that Brittany had been conceived while he was on military maneuvers in the Federal Republic of Germany. After reading the legal memoranda of the parties on this issue, the family law master ordered that the requested blood grouping tests be performed according to specially delineated conditions.

During the course of the final contested hearing on October 6, 1988, Tina T. testified that she had advised the appellant prior to his departure for Germany in September 1984 that a pregnancy test indicated she was pregnant. Because of

this revelation, appellee's counsel moved for a continuance to permit the performance of a second blood grouping test to avoid the slightest possibility of a mistake.

3. Both blood tests indicated that appellant's blood type was O, the appellee's blood type was O, and Brittany T.'s blood type was B. The blood tests further indicated that the likelihood of paternity with respect to Brittany T. was 0%.

4. West Virginia Code § 48A–6–1 provides in relevant part:

> A civil action to establish the paternity of a child and to obtain an order of support for the child may be instituted, by verified complaint, in the circuit court of the county where the plaintiff, the defendant or the child resides. Such action may be brought by any of the following persons:
> (2) A married woman with physical or legal custody of a child to whom she gave birth, if the complaint alleges that:

The circuit court erred in looking to W.Va.Code § 48A–6–1 as a method of resolving this case since that statute relates to the *establishment* of paternity. West Virginia Code § 48A–6–1 clearly was not intended to apply to a proceeding where the issue is *disproof,* rather than proof of paternity. *See* note 4. Accordingly, W.Va. Code § 48A–6–1 is inapplicable because the real issue in this case is whether blood test evidence is admissible in a divorce proceeding to rebut the presumption of legitimacy that accompanies a child born during the course of a valid marriage.

■ Historically, society has frowned upon the bastardization of children. Thus, many states like West Virginia view a child as being presumptively legitimate if the child was born or conceived during a marriage. *See State ex rel. Worley v. Lavender,* 147 W.Va. 803, 809, 131 S.E.2d 752, 756 (1963), *overruled on other grounds; State ex rel. Toryak v. Spagnuolo,* 170 W.Va. 234, 292 S.E.2d 654 (1982); *see generally* 10 Am.Jur.2d *Bastards* § 11 (1963 & Supp.1989). This presumption, which has been referred to as one of the strongest at law, had only two common law defenses: nonaccess and impotence. *See State v. Reed,* 107 W.Va. 563, 566, 149 S.E. 669, 671 (1929). Appellee contends that Michael T. cannot disprove paternity by any method other than these two common law defenses.

Although we recognized in *State ex rel. J.L.K. v. R.A.I.,* 170 W.Va. 339, 294 S.E.2d 142 (1982), that West Virginia's presumption of legitimacy is rebuttable, we have not previously addressed whether blood test evidence is admissible to rebut the presumption of legitimacy. *Id.* 170 W.Va. at 343 n. 9, 294 S.E.2d at 146, n. 9. This Court has acknowledged the scientific reliability of blood test evidence, however. In *State ex rel. Oldaker v. Fury,* 173 W.Va. 428, 317 S.E.2d 513 (1984), the Court stated that "it should be noted that for the purpose of rebutting the presumption of legiti-

macy, the accuracy and reliability of blood tests is widely accepted." *Id.* 173 W.Va. at 529, 317 S.E.2d at 515, n. 1. Based upon the recognized reliability of blood tests, we believe that this Court should join the ranks of numerous other tribunals and admit blood test evidence to rebut the common law presumption of legitimacy under certain circumstances. *See* Annotation, *Admissibility and Weight of Blood–Grouping Tests in Disputed Paternity Cases,* 43 A.L.R. 4th 579 (1986).

Notwithstanding scientific advancements concerning blood-typing and grouping, blood tests cannot establish that a given individual is the father of a child—only that the putative father is within a certain segment of the population with certain genetic traits which make paternity probable. *See id.* at 584–85 (explaining differences between blood-grouping tests and human leukocyte antigen (HLA) tests as well as the genetic rules of inheritance). Blood tests can, however, in some instances conclusively *exclude* a man as the father of a child. *Annotation,* 43 A.L.R. 4th at 585. When blood tests do exclude paternity, "there is now ... practically universal and unanimous judicial willingness to give decisive and controlling evidentiary weight to a blood test exclusion of paternity." *Little v. Streater,* 452 U.S. 1, 7, 101 S.Ct. 2202, 2206, 68 L.Ed.2d 627 (1981) (citing S. Schatkin, *Disputed Paternity Proceedings* § 9.13 (1975)).

The almost universal position that blood tests are admissible evidence regarding the issue of nonpaternity is due to a combination of several factors. *See id.* The first and major reason is the increased scientific reliability of blood test results. The second reason is that the historical basis for the presumption of legitimacy was society's desire to protect children from the stigma of illegitimacy as well as to prevent illegitimate children from becoming wards of the state. *See State ex rel. J.L.K.,* 170 W.Va. at 344–345, 294 S.E.2d at 147. These two

(A) Such married woman lived separate and apart from her husband for a period of one year or more immediately preceding the birth of the child;
(B) Such married woman did not cohabit with her husband at any time during such

separation and that such separation has continued without interruption; and
(C) The defendant, rather than her husband, is the father of the child.

historical bases for opposing bastardization have been significantly vitiated given the modernization of society and legislation drafted to address the problems of bastardization. Specifically, it has been recognized that the stigma of illegitimacy is diminishing in the wake of a society which is composed of so many nontraditional households (e.g. single parents, step-parents, etc.). *See* 2 L. Wardle, C. Blakesley, J. Parker, *Contemporary Family Law: Principles, Policy and Practice,* § 9:01 at 3 (1988). Moreover, most states have statutes similar to W.Va.Code §§ 48A–6–1 to 48A–6–6 (Supp.1989), pursuant to which paternity can be established and awards of child support and maintenance made, thereby removing the financial burden of bastardization historically placed on the state.

One final reason advanced by appellee in favor of avoiding bastardization is the preservation of the family unit. *See Michael H. v. Gerald D.,* 491 U.S. 110, 109 S.Ct. 2333, 2343–44, 105 L.Ed.2d 91 (1989). Unfortunately, the realities of modern America belie this concern as evidenced by the fact that nearly one out of every two marriages ends in divorce.[5] In the face of a defunct or nearly defunct marriage, the need to uphold the sanctity of the traditional nuclear family fails as a justification for avoiding bastardization. Furthermore, when the issue of paternity is raised during a divorce proceeding, preserving the family no longer stands as a valid defense to bastardization.

Of the two general types of blood-testing (blood-grouping and HLA), the record in this case discloses that blood-grouping tests were performed.[6] The general rule regarding the admissibility of blood-grouping tests is that the tests, providing they were properly performed and proffered in evidence, are admissible for the purpose of establishing nonpaternity. Annotation, 43 A.L.R. 4th at 585. This general rule of admissibility has two exceptions: "(1) [blood-grouping] evidence is inadmissible to rebut a *conclusive* presumption of legitimacy of the child in question ...; and (2) such evidence is inadmissible to rebut a husband's or a former husband's paternity where the law estops the husband or former husband from disputing the paternity of the child in question...." *Id.* (emphasis in original).

Our Legislature has left no question regarding the admissibility of blood test evidence in a proceeding initiated to *establish* paternity. West Virginia Code § 48A–6–3 (Supp.1989) provides in relevant part that:

(a) [t]he court, may, on its own motion, or shall upon the motion of any party, order the mother, her child, and the man to submit to blood tests or tissue tests to aid the court in proving or disproving paternity. If such tests are ordered, the court shall direct that the inherited characteristics, including, but not limited to, blood types, be determined by appropriate testing procedures at a hospital, independent medical institution or independent medical laboratory, duly licensed under the laws of this state, or any other state, and shall appoint an expert qualified as an examiner of genetic markers to analyze and interpret the results and to report to the court. The court shall consider the results as follows:

(1) Blood or tissue test results which exclude the man as the father of the child are admissible and shall be clear and convincing evidence of nonpaternity and the court shall, upon considering such evidence, dismiss the action.

(2) Blood or tissue test results which show a statistical probability of paternity of more than seventy-five percent are admissible and shall be weighed along with other evidence of the defendant's paternity.

5. *See* U.S. Dep't of Commerce, *Statistical Abstract of the United States,* table no. 127 at p. 85 (109th ed. 1989) (latest census figures (1985) indicate that forty-nine percent of all marriages in the United States ultimately result in divorce).

6. "The red cell blood-grouping tests include the ABO, MN, and Rh–Hr systems, and classify only red blood cells into one of several groups. The ABO system groups blood into four types: A, B, AB, and O." Annotation, 43 A.L.R. 4th at 585. The record indicates that the ABO and Rh–Hr systems were used in connection with the blood tests performed in this case.

The question put to this Court, however, is whether blood tests are admissible evidence in a divorce proceeding for the express purpose of *disproving* paternity. We hold that when a putative father seeks to use blood test results to disprove his paternity and rebut the presumption of legitimacy which has attached to a child born of a valid marriage, an *in camera* hearing should be held in order for the circuit court to make a preliminary determination whether the equities surrounding the particular facts and circumstances of the case warrant admission of blood test results. If by utilizing the criteria set forth herein, the circuit court[7] determines that the equities of the situation do not preclude the admission of blood test results, blood test evidence which conclusively establishes that an individual is *not* the father of a child may be admissible in a divorce proceeding to rebut the presumption of legitimacy that arises when a child is born or conceived during a marriage. This ruling is based upon the inherent inequity which results when a man is forced to bear the financial burden of child support when he did not father the child or knowingly hold the child out to be his own.

Since the admissibility of blood test evidence which does not conclusively exclude paternity in the course of a divorce or support proceeding is not properly before the Court at this time, we do not address this issue. We do note, however, that such evidence is admissible in a proceeding to establish paternity provided that the blood test results show a statistical probability of paternity of more than seventy-five percent. *See* W.Va.Code § 48A–6–3(a)(2).

In holding that blood test evidence is admissible to rebut the presumption of legitimacy, we do so with a significant caveat. Even if blood test evidence excludes paternity in a given case, the trial judge

should refuse to permit blood test evidence which would disprove paternity when the individual attempting to disestablish paternity has held himself out to be the father of the child for a sufficient period of time such that disproof of paternity would result in undeniable harm to the child. To prevent an individual from disproving paternity after he had held himself out to be the father of a child, some courts have applied the doctrine of equitable estoppel. *See Brite v. Brite,* 61 Misc.2d 10, 305 N.Y.S.2d 65 (1969) (doctrine of estoppel barred admission of blood-grouping test results which demonstrated nonpaternity given father's failure to question paternity during six year period prior to divorce); *Commonwealth ex rel. Gonzalez v. Andreas,* 245 Pa.Super 307, 369 A.2d 416 (1976); *Commonwealth ex rel. Hall v. Hall,* 215 Pa.Super. 24, 257 A.2d 269 (1969) (doctrine of estoppel precluded husband from using blood-grouping tests to establish nonpaternity where child was acknowledged as husband's in separation agreement and paternity was not questioned until one year following separation); Annotation, 43 A.L.R. 4th at 610–15 (1986); *but cf. NPA v. WBA,* 8 Va.App. 246, 380 S.E.2d 178 (1989) (doctrine of equitable estoppel could not be applied to require non-biological father to pay child support because he did not knowingly misrepresent to child that he was the natural father and child suffered no detriment).

The *Andreas* court explained its decision to exclude blood test evidence which was conducted seven years after the birth of the child in question as follows:

> Absent any overriding equities in favor of the putative father, such as fraud, the law cannot permit a party to renounce even an assumed duty of parentage when by doing so, the innocent child

---

7. The *in camera* hearing may be held before the family law master if the matter is already before the family law master, as in this case. Following such *in camera* hearing, the family law master shall prepare a recommended decision in accordance with W.Va.Code § 48A–4–4 (1986) solely on the issue of the advisability of admitting blood test evidence in view of the criteria set forth in this opinion. The circuit court must approve or reject the family law master's recommendation prior to the entry of any order directing that blood tests be performed.

would be victimized. Relying upon the representation of the parental relationship, a child naturally and normally extends his love and affection to the putative parent. The representation of parentage inevitably obscures the identity and whereabouts of the natural father, so that the child will be denied the love, affection and support of the natural father. As time wears on, the fiction of parentage reduces the likelihood that the child will ever have the opportunity of knowing or receiving the love of his natural father. While the law cannot prohibit the putative father from informing the child of their true relationship, it can prohibit him from employing the sanctions of the law to avoid the obligations which their assumed relationship would otherwise impose.

369 A.2d at 419.

■ On numerous previous occasions, this Court has voiced its opinion that the best interests of the child is the polar star by which decisions must be made which affect children. *See State ex rel. Cash v. Lively*, 155 W.Va. 801, 187 S.E.2d 601, 604 (1972). Accordingly, whenever a sufficient period of time has passed that disproof of paternity would result in undeniable harm to the child, the trial judge should refuse to admit blood test evidence which would disprove paternity. We do not establish a finite period of time which must have passed before blood test evidence is inadmissible, because we recognize that the facts of each case must be examined to determine whether equity demands that paternity remain unchallenged. *See Andreas*, 369 A.2d at 419. However, absent evidence of fraudulent conduct which prevented the putative father from questioning paternity, this Court will not sanction the disputation of paternity through blood test evidence if there has been more than a relatively brief passage of time. We make this ruling, recognizing as the *Andreas* court did so eloquently, that the law favors the innocent child over the putative father in certain circumstances. *See id.*

The purpose of the *in camera* hearing is to give the circuit court an opportunity to weigh preliminarily whether blood test evidence should be admitted for the purpose of disproving paternity. The facts which must be considered at this hearing include the following:

(1) the length of time following when the putative father first was placed on notice that he might be the biological father before he acted to contest paternity;

(2) the length of time during which the individual desiring to challenge paternity assumed the role of father to the child;

(3) the facts surrounding the putative father's discovery of nonpaternity;

(4) the nature of the father/child relationship;

(5) the age of the child;

(6) the harm which may result to the child if paternity were successfully disproved;

(7) the extent to which the passage of time reduced the chances of establishing paternity and a child support obligation in favor of the child; and

(8) all other factors which may affect the equities involved in the potential disruption of the parent/child relationship or the chances of undeniable harm to the child.

Since the record of this case is devoid of any evidence other than the fact that Michael T. lived with Tina T. as husband and wife until Brittany T. was 13 months old, we must remand this case to the circuit court to determine whether, based on the above outlined factors, it was equitable to admit blood test evidence which could disprove paternity. Normally, this hearing would occur prior to the order permitting blood tests to be performed. If the circuit court, after the taking of evidence and upon due consideration of the criteria set forth herein, determines that blood test evidence should be admissible to disprove paternity, then the previously obtained blood test results mandate that Michael T. be declared not to be the father of Brittany T. and further, that he be relieved from the

circuit court's order which required him to pay child support for Brittany T.

■ Although it is clear that a child advocate is required to represent a child's interest in an action to establish paternity, W.Va.Code § 48A–6–5 (Supp.1989),[8] it is uncertain whether this statute would require a child advocate to represent the child when the issue of paternity is raised in the course of a proceeding other than one specifically filed for the purpose of establishing paternity. The appointment of a guardian *ad litem* is necessary to protect the child's interests with respect to paternity. As our Legislature has recognized, children clearly have a right to discover who their parents are and to have support and maintenance obligations established in their favor. *See* W.Va.Code §§ 48A–6–1 to 48A–6–6. Until legislative enactment occurs which specifically addresses this issue, a guardian *ad litem* should be appointed to represent the interests of the minor child whenever the issue of disproving paternity is raised outside of a proceeding contemplated by W.Va.Code § 48A–6–1. The fees of such guardian *ad litem* are to be borne by the party or parties to the divorce who the court determines is/are best able to bear such expense, or in the case of indigency of the parties, by the state.

Based upon the foregoing, this case is remanded to the circuit court first, for a determination of the admissibility of the blood test evidence in view of the factors set forth in this opinion, and second, for entry of a new final order which comports with the rulings set forth in this opinion.

Remanded.

---

**8.** West Virginia Code § 48A–6–5 provides in relevant part that: "(a) The children's advocate of the county where the action under this section [Establishment of Paternity] is brought shall litigate the action in the best interests of the child...."