474 S.E.2d 554

**STATE of West Virginia ex rel., ROY ALLEN S., Petitioner,**

v.

**Honorable Robert B. STONE, Judge of the Circuit Court of Monongalia County, Thomas S. and Tina Marie P.S., Respondents.**

No. 23355.

Supreme Court of Appeals of West Virginia.

Submitted April 23, 1996.

Decided June 14, 1996.

J. Michael Benninger, Wilson, Frame, Benninger & Matheny, Morgantown, for Petitioner.

Fonda L. Holehouse, Morgantown, for Respondent Thomas S.

Cheryl A. McCray, Hamstead, Hamstead & Williams, Morgantown, guardian *ad litem.*

CLECKLEY, Justice.

In this original proceeding in prohibition, we must decide whether W.Va.Code, 48A–6–1 (1993),[1] violates the Due Process Clause in Section 10 of Article III of the West Virginia Constitution. The relator, Roy Allen S. (Roy),[2] requests this Court to issue a rule to show cause why a writ of prohibition should not be issued against the respondent, the Honorable Robert B. Stone, Chief Judge of the Circuit Court of Monongalia County, as a result of the circuit court's order and opinion directing that a blood sample be taken from the minor child, Jennifer S. (Jennifer), for the purpose of determining her paternity.

## I.

### FACTUAL AND PROCEDURAL HISTORY[3]

Roy and Tina Marie P.S. (Tina),[4] were married on January 29, 1983. Roy and Tina had a very tumultuous relationship. According to the respondent, Thomas S. (Thomas), Tina became pregnant by him on September 1, 1986.[5] Tina gave birth to Jennifer on June 1, 1987, and designated on the birth certificate that Roy was the father of the child, even though Thomas was present during the birth of the child. Roy did not return to his wife until some time after the birth of Jennifer. Over the course of three years, Roy's and Tina's relationship did not improve. According to Thomas's brief, Tina maintained

contact with Thomas during this period and took Jennifer to visit him frequently. Tina eventually filed for divorce and began living with Thomas. At that time, Tina had custody of her two children.[6] Thomas stated he undertook various caretaking responsibilities and the children developed a strong bond with him during this period.

According to Roy's brief, in the complaint for divorce filed by Tina on July 22, 1991, she specifically alleged " 'two children were born of the marriage, Christina [S.] . . ., born September 19, 1983[,] and *Jennifer [S.] . . ., born June 1, 1987.* ' " (Emphasis in brief). In his answer to the complaint, Roy admitted two children were born of the marriage. On or about August 6, 1992, Tina signed a joint parenting agreement which indicated she and Roy had reached an agreement concerning joint custody that was for the benefit "of their children." This agreement was filed with the family law master and incorporated into the family law master's Findings of Fact and Conclusions of Law dated August 10, 1992. The circuit court entered the final divorce decree which approved the joint parenting agreement on August 25, 1992.

Sometime after entry of the divorce decree, Tina filed a petition to change and modify custody as set out in the final divorce decree. Specifically, Tina wanted full custody of the two children and additional support from Roy. Roy filed a counter petition seeking custody of the two children. A full evidentiary hearing concerning the petitions for custody was held on December 8, 1992. At this hearing, both Roy and Tina testified the two minor children were born of their mar-

1. W. Va.Code, 48A–6–1, was amended in 1995, but the changes do not affect the outcome of this case.

2. We follow our traditional practice in cases involving sensitive facts and do not use the last names of the parties. *See, e.g., In the Matter of Scottie D.,* 185 W.Va. 191, 406 S.E.2d 214 (1991); *State ex rel. Division of Human Servs. by Mary C.M. v. Benjamin P.B.,* 183 W.Va. 220, 395 S.E.2d 220 (1990).

3. As will be discussed *infra,* many of the facts of this case are highly contested.

4. Tina married the respondent, Thomas S., after her divorce from Roy.

5. There is some discrepancy that should be examined by the circuit court concerning the timing of the conception of Jennifer. Tina's statement of facts notes that she was still married to Roy, but they had not had sexual intercourse for six months. Thomas's facts state, however, that Roy did not leave the marital residence until after learning of the pregnancy.

6. While married to Roy and prior to having Jennifer, Tina gave birth to another child. This child's paternity is not at issue.

riage.[7] The family law master then filed his Findings of Fact and Conclusions of Law on December 14, 1992, which granted Roy full custody of both minor children.

On December 23, 1992, Tina filed a petition for review of the family law master's findings alleging Roy was not the biological father of Jennifer. By a memorandum order dated February 3, 1993, the circuit court denied Tina's petition for review citing that Tina " 'testified on at least two (2) occasions that Jennifer was born as a result of the marriage of the parties . . . [and that] both parties held . . . [Roy] . . ., out to the world as the father of Jennifer.' " Affirming the family law master's findings, the circuit court also found " 'it is inappropriate, insensitive and boarding [sic] on unconscionable' " to assert for the first time on review that someone other than Roy, who was Tina's ex-husband, might be the biological father of the child.[8] In her response to the petition for a writ of prohibition, Tina explains that she admitted during the divorce proceedings that Roy was the father of the two minor children because her then-attorney advised her she could not raise the issue of paternity in that forum. Apparently after obtaining new counsel, Tina first raised the issue of paternity during her petition for review of the family law master's findings. Under Tina's accounting of the facts, Jennifer was conceived at a time when she and Roy were living separate and apart although still legally married.

On April 15, 1994, Thomas filed a paternity action against Tina and Roy asserting that he, and not Roy, is the biological father of Jennifer. On June 22, 1994, a hearing was conducted by the family law master. In his recommended order filed on September 13, 1994, the family law master dismissed Thomas's petition finding he had no standing to bring the paternity action. Both Tina and Thomas filed petitions for review of the family law master's order. Oral arguments were held on December 14, 1994. On November 28, 1995, the circuit court entered an order reversing the family law master's dismissal of the paternity action and remanding the matter back to the family law master to conduct proceedings consistent with the memorandum order. Expressing concern that the family law master's interpretation of W. Va.Code, 48A–6–1(e)(8), raised serious constitutional concerns of equal protection and due process, the circuit court held Thomas, as the putative biological father, was entitled to pursue his paternity action. The circuit court also found that, because Thomas was a stranger to the divorce action, he could not be barred under doctrines of *res judicata* or collateral estoppel. The circuit court subsequently appointed a guardian *ad litem* for Jennifer. Roy filed a petition for a writ of prohibition to be issued by this Court to prevent the paternity test for Jennifer.

## II.

## DISCUSSION

### A. *Procedural Issues*

At the center of this controversy is the question whether a person claiming to be the biological father of a child may raise the issue of paternity if the child was born during a valid marriage between the mother and another man. The relevant statute, W. Va. Code, 48A–6–1(e), provides, in part:

"A paternity proceeding may be brought by any of the following persons:

"(1) An unmarried woman with physical or legal custody of a child to whom she gave birth;

"(2) A married woman with physical or legal custody of a child to whom she gave birth, if the complaint alleges that:

"(A) Such married woman lived separate and apart from her husband preceding the birth of the child;

"(B) Such married woman did not cohabit with her husband at any time during

---

7. Moreover, Thomas, who claims to be the biological father of Jennifer, testified on Tina's behalf at the December 8, 1992, hearing. However, he failed to mention that he had any relationship to the child.

8. Apparently, there have been additional proceedings where Tina has attempted to modify the custody arrangement, all of which resulted in Roy maintaining custody. Tina has not attempted to appeal either the decision of the family law master or the circuit court in regard to the underlying divorce action.

such separation and that such separation has continued without interruption; and

"(C) The defendant, rather than her husband, is the father of the child;

"(3) The state of West Virginia or the department of health and human resources, or the child advocate office on its behalf, when such proceeding is deemed necessary to prevent such child from being or becoming a public charge;

"(4) Any person who is not the mother of the child, but who has physical or legal custody of such a child;

"(5) The guardian or committee of such a child;

"(6) The next friend of such child when the child is a minor;

"(7) By such child in his own right at any time after the child's eighteenth birthday but prior to the child's twenty-first birthday; or

"(8) A man purporting to be the father of a child born out of wedlock, when there has been no prior judicial determination of paternity."

The circuit court feared that precluding a putative biological father from seeking a paternity determination under the statute would threaten its constitutionality. To avoid the threat, the circuit court read the language a "child born out of wedlock" in subsection (8) to include a child born to a married woman but fathered by someone other than her husband. By that reading, the circuit court permitted Thomas to raise the issue of paternity.

In his petition to this Court, Roy asserts that the statute's authorization for a putative biological father to file an action regarding the paternity of a "child born out of wedlock" applies only when the child is born to a then-unmarried woman. Roy also contends that the presumption of legitimacy of a child born during a marriage is "one of the strongest at law" and, thus, bars any action on the part of Thomas to challenge the paternity of Jennifer. Thomas and Tina respond that Roy has failed to establish sufficient grounds for granting the extraordinary writ of prohibition.

■ As a threshold matter, we must address the question whether prohibition is proper. We hold that it is. Concededly, writs of prohibition concerning remands to the family law master for further development are as rare as hen's teeth, used only to control usurpations of jurisdiction. Our precedents establish that prohibition is not an appropriate device merely to correct an erroneous, interlocutory, procedural ruling. This case, however, involves much more than a procedural ruling. It involves the likely invasion of substantive rights and interests protected by a controlling West Virginia statute. The statute limits the class of litigants who can initiate paternity actions. As discussed below, the apparent legislative assumption is that, if liberally allowed, paternity actions could disrupt harmonious marriages and families, could interfere with a child's best interests, could be used purely for vindictive and vexatious purposes, and could violate the rights of a child and/or the presumed father if the two have already established a father-child bond. Thus, if the petitioner is correct as to the reach of the statute, unless this Court intervenes, these rights and interests will be forever lost. Moreover, this petition presents a substantial issue of constitutional dimension implicating high level public policy matters. In *State ex rel. U.S. Fidelity and Guaranty Co. v. Canady*, 194 W.Va. 431, 460 S.E.2d 677 (1995), we suggested prohibition is an appropriate remedy if the rights to be protected will be lost or substantially diminished if not vindicated prior to the violation. Otherwise, the apparent statutorily protected right is not a right at all but merely a cruel illusion. We expressly find the rights at stake in this proceeding "would be lost forever if the offended party is forced to 'run the gauntlet' before having an opportunity to seek redress before this Court." *State ex rel. U.S. Fidelity and Guaranty Co. v. Canady*, 194 W.Va. at 437, 460 S.E.2d at 683. We, therefore, proceed to the merits.

The circuit court's ruling—because an exclusion of putative biological fathers from challenging the paternity of marital children could violate due process and equal protection, W. Va.Code, 48A–6–1, must be read to authorize such actions—was an exercise of

statutory and constitutional interpretation; it, therefore, receives *de novo* consideration in this Court. *See* Syl. pt. 1, *State ex rel. Cooper v. Caperton*, 196 W.Va. 208, 470 S.E.2d 162 (1996); *Appalachian Power Co. v. State Tax Dep't of W.Va.*, 195 W.Va. 573, 466 S.E.2d 424 (1995).

## B.

### The Constitutionality of W.Va.Code, 48A–6–1

■■■ Proceeding to the merits of the petition, we believe it is necessary to resolve directly the constitutional issue. Courts may not reform statutes to correct perceived inadequacies.[9] What the circuit court did was not a construction of the statute, but was, in effect, an enlargement of the statute so that what was omitted, either by design or inadvertence, could be included within its scope. To supply these omissions by way of statutory construction transcends the judicial function.

It is far too great a leap to conclude from this asserted shortcoming in the statutory scheme that the Legislature intended to permit a putative biological father, under the circumstances of this case, standing to initiate a paternity action. The Legislature plausibly could have expected a putative father bent on establishing paternity to invoke or elicit the help of one who was granted standing under the statute to bring the paternity action on his behalf. On the other hand, the asserted "gap" or "exclusion" might be the result of simple oversight or poor draftsmanship, due in part, perhaps, to an expectation that it would be an aberrational situation where a single man would want to claim paternity of a child born in a marriage of another couple. Unlike the circuit court, we choose not to rewrite the statute but choose to construe it consistent with its plain meaning.

It would be strange, indeed, to assume that the Legislature wanted to endow a putative father with standing under these circumstances but lacked the ability to draft such a provision. We are reluctant to take that direction because all canons of construction suggest otherwise. Even if one of the familiar canons supported the maneuver employed by the circuit court, we should resort to such canons only where the literal words of the statute do not clearly answer the interpretive question. *See Appalachian Power Co. v. State Tax Dep't of W.Va.*, 195 W.Va. at 587, 466 S.E.2d at 438 ("[w]e look first to the statute's language. If the text, given its plain meaning, answers the interpretive question, the language must prevail and further inquiry is foreclosed").[10] As the United States Supreme Court once remarked: "[T]his is a case for applying the canon of construction of the wag who said, when the legislative history is doubtful, go to [words of] the statute." *Greenwood v. United States*, 350 U.S. 366, 374, 76 S.Ct. 410, 415, 100 L.Ed. 412, 419 (1956). Having no legislative history to guide us, we conclude that none of the statutory arguments persuade us that the Legislature intended W. Va.Code, 48A–6–1(e), to allow *sub silentio* standing to an alleged biological father other than explicitly provided therein.[11]

■■■ Under the common law, a child born to a married woman was presumed to be the product of the marriage, and her husband was the presumed father. The presumption could be overcome only by proof of the hus-

---

**9.** *See Wolf Creek Collieries v. Robinson*, 872 F.2d 1264, 1269 (6th Cir.1989) ("[i]t is not the Court's role to address perceived inadequacies in [a statute]").

**10.** The circuit court relied on the proposition that where an otherwise acceptable construction of a statute would raise serious constitutional problems, the court should construe the statute to avoid such problems. This canon of statutory construction is based on the prudential concern that constitutional issues not be needlessly confronted and on respect for the Legislature, which we assume legislates in light of constitutional limitations. We applied this principle most re-

cently in *West Virginia Human Rights Comm'n v. Garretson*, 196 W.Va. 118, 124, 468 S.E.2d 733, 739 (1996) ("[a]s in any case of statutory construction, we must interpret the law to avoid constitutional conflicts, if the language of the ... [statute] *will reasonably permit such an avoidance*" (Emphasis added)). However, this case is quite different.

**11.** *"Inclusio unius est exclusio alterius,"* the expression that "one is the exclusion of the others," has force in this case. This doctrine informs courts to exclude from operation those items not included in the list of elements that are given effect expressly by statutory language.

band's absence or impotence and could not be assailed at all by individuals outside the marriage. *Michael K.T. v. Tina L.T.*, 182 W.Va. 399, 387 S.E.2d 866 (1989). W. Va. Code, 48A–6–1, *et seq.*, which modified some aspects of the common law, permits a putative biological father to bring a paternity action only if the child has no presumed father. Other parties, however, including the husband, wife, child, and the State, may have standing to initiate a paternity action, even though the child was born in wedlock, and may use such action to require a putative biological father who is not married to the mother to honor child support obligations. This scheme, Thomas contends, violates his rights to due process and equal protection of the law. Because we agree with Thomas that the bar to his paternity claim violates due process, we do not consider his equal protection arguments.

■ In determining whether a law violates the Due Process Clause in Section 10 of Article III of the West Virginia Constitution, the first step is to determine whether the challenged provision implicates a liberty interest.[12] In this case, we must decide whether a putative biological father has a liberty interest in maintaining a relationship with a child who was born while the child's mother was married to another man. A longstanding line of cases at the federal level and in West Virginia, as well as in other state courts, recognizes that "liberty" within the meaning of the Due Process Clause embraces the rights of parenthood,[13] and that umbrella includes a parent's right to establish and preserve relationships with his or her children, even if they are born outside the traditional family. *E.g., Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983); *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *McGuire v. Farley*, 179 W.Va. 480, 370 S.E.2d 136 (1988); *J.M.S. v. H.A.*, 161 W.Va. 433, 242 S.E.2d 696 (1978).

This case does add a new element. Prior decisions deal either with the parenting rights of some legally recognized relative or with the rights of natural fathers of children born to unmarried women. Here the child in question was born into the mother's marriage with another man and thus, under the common law, is presumed to be the legitimate child of the marital couple. *See, e.g., McGuire v. Farley, supra.* We are well aware that the United States Supreme Court in *Michael H. v. Gerald D.*, 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989) (plurality opinion) upheld a California law that precluded a putative father from establishing paternity over a child born into another man's marriage. We decline to follow *Michael H. v. Gerald D., supra*, however, in construing our own Due Process Clause. We do so for two reasons. First, the split on the *Michael H. v. Gerald D.* Court weakened the case's

12. This is the first step regardless of whether the challenge is procedural or substantive. As should become clear below, we analyze the issue in this case as one of substantive due process, which places us in agreement (on this point) with the plurality opinion in *Michael H. v. Gerald D.*, 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989), which is discussed in the text, *infra*. An argument can be made that this is a case of procedural due process, *Michael H.*, 491 U.S. at 136, 109 S.Ct. at 2349, 105 L.Ed.2d at 114 (Brennan, J., dissenting), *i.e.*, that the statutory refusal to allow the putative father an opportunity to prove his claim and vindicate his rights as a father is a failure of process. The validity of that refusal, however, necessarily turns on the sufficiency of the State's justification for making it. Put another way, the State in this case is not attempting to invoke its powers to terminate a liberty interest based upon some evidentiary standard, *see, e.g., Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977); *Major v. DeFrench*, 169 W.Va. 241, 286 S.E.2d 688 (1982); rather, the State is refusing to extend the liberty to an entire class of individuals. And the validity of that refusal "must ultimately be analyzed as calling into question not the adequacy of procedures but ... the adequacy of the 'fit' between the classification and the policy that the classification serves." *Michael H. v. Gerald D.*, 491 U.S. at 121, 109 S.Ct. at 2341, 105 L.Ed.2d at 104. (Plurality opinion; citations and some text omitted). We perceive that to be an assessment that is more accurately characterized as "substantive" rather than "procedural". The bottom line may be, however, that it does not really matter which handle one attaches.

13. *E.g., Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983); *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), *abrogated in part and recognized by Abbott v. Bragdon*, 912 F.Supp. 580 (D.Maine 1995).

precedential authority. The central holding of the plurality—that the putative father did not have an affected liberty interest—was joined in by only four justices. Four other justices expressly disagreed and insisted the putative father had a liberty interest in his relationship with the child in question. A fifth, Justice Stevens, cast the decisive vote, while concurring only in the judgment; he assumed the father could have a protected liberty interest in the child, even though the "mother was married to, and cohabiting with, another man at the time of the child's conception and birth." 491 U.S. at 133, 109 S.Ct. at 2347, 105 L.Ed.2d at 112 (Stevens, J., concurring in the judgment).[14] Thus, even as a matter of federal constitutional law, *Michael H. v. Gerald D., supra,* does not preclude recognition of a liberty interest in this case.

■ Second, and more substantively, we find reason to interpret our own Due Process Clause in Section 10 of Article III of the West Virginia Constitution to encompass the liberty interest claimed by Thomas. In our view, the federal and state decisions cited above [15] regarding the liberty interests of fathers of illegitimate children were not premised, as the *Michael H. v. Gerald D.* plurality insists, on the maintenance of rights within the traditional family unit. 491 U.S. at 121–24, 109 S.Ct. at 2341–42, 105 L.Ed.2d at 104–06. Rather, they *focus on the personal stakes of fathers in their relationships with their children, regardless of whether the setting is traditional. E.g., Lehr v. Robertson, supra; Stanley v. Illinois, supra.* As the Court said in *Stanley,* "the law [has not] refused to recognize . . . family relationships unlegitimized by a marriage ceremony. . . . 'To say that the test of . . . [constitutionality]

should be the "legal" rather than the biological relationship is to avoid the issue. For the . . . [Constitution] necessarily limits the authority of a State to draw such "legal" lines as it chooses.'" 405 U.S. at 651–52, 92 S.Ct. at 1213, 31 L.Ed.2d at 559. *See also Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (grandmother had substantive due process interest in maintaining unitary household that included extended family). In our opinion, the strength of a parent's bond with his or her child is not dependent upon some official or traditional arrangement; rather, the strength derives from the parent's personal and emotional investment and the relationship that develops from that investment. The "liberty" of the Due Process Clause is grounded in protecting those concerns, such as parenting, that are vital to an individual's self-fulfillment and not in preserving formalities. *See also* W. Va. Const. Art. III, § 1 ("[a]ll men . . . have certain inherent rights, of which, . . . they cannot . . . deprive or divest their posterity, namely: The enjoyment of life and liberty, with the means . . . of pursuing and obtaining happiness and safety"); *Women's Health Center v. Panepinto,* 191 W.Va. 436, 446 S.E.2d 658 (1993).[16]

We are, therefore, in obvious disagreement with Justice Scalia's contention, which was joined in by only one other justice, that liberty interests should be defined only at the most specific level of our society's traditions. *See Michael H. v. Gerald D.,* 491 U.S. at 127–28 n. 6, 109 S.Ct. at 2344–45 n. 6, 105 L.Ed.2d at 108–09 n. 6. Such a reading runs contrary to the holdings of many cases,[17] fails to accord proper respect to diversity and individualism, and pretty much protects only those liberties that rarely need judicial pro-

14. Justice Stevens concurred on the basis of his reading of the California statute, which, he said, adequately provided for the putative father's liberty interest.

15. *I.e., Lehr v. Robertson, supra; Stanley v. Illinois, supra; McGuire v. Farley, supra; J.M.S. v. H.A., supra.*

16. Of course, the preservation of marriage as an institution and its role in a lawful society is vital to our public interest and policy. In disputed paternity actions, such as this one, we merely state that an existing marriage is but one factor,

albeit important, in the consideration of granting standing to a putative father to challenge paternity.

17. *E.g., Carey v. Population Services,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), *modified by Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972).

tection. We recognize Justice Scalia's argument that his reading minimizes judicial intervention into political choices. We are not convinced, however, that confining liberty to the most specific level of a tradition will either effectively limit judicial discretion (what "traditions" qualify and what is their most specific level of questions that do not produce self-evident answers) or achieve just results.

We do agree with Justice Scalia that courts must proceed with the greatest caution when identifying and defining non-enumerated constitutional rights. Moreover, we confess there is no magic formula to guide us in that undertaking. Unless we are ready to hold that the "liberty" in Section 10 of Article III refers only to freedom from bodily restraint—a position that this Court has never held and that is contrary to the uniform interpretation of the Due Process Clauses in the United States Constitution and other state constitutions [18]—then we are forced onto the slippery path of identifying and defining non-enumerated rights. We undertake such steps ever mindful of our limitations and responsibilities as judges and of the instructive words of Justice Harlan:

> "Judicial self-restraint will ... be brought about in the 'due process' area ... only by continual insistence upon respect for the teachings of history, solid recognition of the basic values that underlie our society, and wise appreciation of the great roles that the doctrine[ ] of ... separation of powers ha[s] played in establishing and preserving American freedoms." *Gris-*

*wold v. Connecticut,* 381 U.S. 479, 501, 85 S.Ct. 1678, 1691, 14 L.Ed.2d 510, 525 (1965). (Harlan, J., concurring).

In this case, however, our task is not really so difficult because we read our precedents as recognizing that a father has a liberty interest in maintaining an established parent-child relationship, regardless of whether the relationship is within traditional and official parameters. *E.g., McGuire, supra* [19]; *J.M.S., supra.* We do not believe the added fact that the child was born while the mother was married to another man necessarily precludes the maturation of the biological father's liberty interest. Depending on the circumstances, the biological father could still make the personal and emotional investments and develop the same relationship that we have found to be protected in our prior cases. Accordingly, we hold that, where a biological father has made a "substantial" personal investment in his relationship with his child, he acquires a liberty interest in maintaining that relationship.

What the added fact of the pre-existing marriage does, however, is alter the nature and weight of the State's interests. Merely identifying that a law affects an individual liberty is not the end of the matter; our doctrines permit the State to intrude upon liberties protected by the Due Process Clause when reasonably necessary to accomplish a goal of countervailing importance.[20] Historically, the justifications for precluding litigation over the paternity of a child born into wedlock were to prevent illegitimizing

---

**18.** We also would have to concede that the guarantee of the "enjoyment of life and liberty, with the means of ... pursuing and obtaining happiness and safety" found in Section 1 of Article III of the West Virginia Constitution is completely unenforceable. This concession would be contrary to our conclusion in *Panepinto, supra.* Because the parties have not invoked that provision, however, we do not consider its impact on this case.

**19.** *McGuire* did state: "It is not our intention to encourage or allow third parties [ (outside of a marriage) ] to initiate paternity actions in such situations." That language, however, was merely *dicta* in an opinion that otherwise emphasized the importance of the natural father's liberty interest. We believe the rationale of *McGuire,* as well as other developments and decisions de-

scribed in the text, supports our holding in this case.

**20.** We, therefore, agree with Justice Brennan's dissent in *Michael H.,* 491 U.S. at 136, 109 S.Ct. at 2349, 105 L.Ed.2d at 114, that the concerns articulated in the plurality about the value of preserving traditional family units and their integrity should not be relied on in refusing to recognize the existence of a liberty interest but are more properly considered in assessing whether the State has a sufficiently important interest to justify imposing a limitation on that liberty. After all, even the most unquestionably accepted liberties—*e.g.,* freedom from bodily restraint, freedom of speech—are subject to limitation when necessary to accomplish a compelling governmental goal.

the child and avoiding court battles over a divisive matter that is not easily subject to proof. As demonstrated below, however, societal enlightenment and scientific advances largely have eviscerated those interests.

In the past, the legal system did not protect the rights of an illegitimate child in the same fashion as a legitimate child. The harsh reality was that illegitimate children often had to rely on the government to care for their needs because there were no remedies at common law to compel a putative biological father to care for any illegitimate children he may have sired. *See Holmes v. Clegg*, 131 W.Va. 449, 451, 48 S.E.2d 438, 440 (1948), *overruled on other grounds by State ex rel. Toryak v. Spagnuolo*, 170 W.Va. 234, 292 S.E.2d 654 (1982). *See also State ex rel. J.L.K. v. R.A.I.*, 170 W.Va. 339, 294 S.E.2d 142 (1982). "At common law, an illegitimate child was considered to be *filius nullius*, or child of no one." Sunny J. Jansma, *Casenote: Family Law—Presumption of Paternity—Denying a Biological Father Standing to Establish His Paternity of a Child Who has a Presumed Father, Under Texas Family Code Sections 11.03(a)(7) and 12.06(a), Violates the Texas Due Course of Law Guarantee*, 25 St. Mary's L.J. 821, 827–28 (1994). In addition, illegitimate children did not enjoy the same inheritance rights as those who were legitimate. Social stigmatization of "bastards" further contributed to the unfortunate plight of illegitimate children. These legal and social disabilities led to the presumption that a child born during a valid marriage was presumed a child of the marriage.[21] It was a strong presumption and could be overcome only by proof that the husband did not have access to his wife during the time of conception or that he was

impotent. *See Michael K.T. v. Tina L.T.*, 182 W.Va. 399, 387 S.E.2d 866 (1989).

In recent decades, however, both the law and social attitudes have changed and have largely eliminated the pre-existing discrimination. Over time, legislatures created statutory provisions to assist in determining paternity. The goal behind such paternity proceedings was "to prevent the child from becoming a public charge, and to compel the father to maintain and support it for such period as may be fixed by the court." *Holmes v. Clegg*, 131 W.Va. at 451, 48 S.E.2d at 440. *See also* Syl. pt. 6, *State ex rel. Crouser v. Mercer*, 141 W.Va. 691, 92 S.E.2d 745 (1956), *overruled on other grounds by State ex rel. Toryak v. Spagnuolo, supra; State ex rel. Cottrill v. Jarvis*, 121 W.Va. 496, 5 S.E.2d 115 (1939), *overruled on other grounds by State ex rel. Toryak v. Spagnuolo, supra.* Moreover, court decisions applying equal protection doctrines have denounced treating illegitimate children differently from those born during a marriage.[22] The common law has evolved, too. Although *Michael K.T. v. Tina L.T., supra*, repeated the presumption of legitimacy is "one of the strongest at law," the case limited the presumption by adding the use of blood tests to the common law grounds of impotence and nonaccessibility as bases for excluding paternity. We justified the result by recognizing that the impact of societal changes requires the presumption to give way at times:

> "The almost universal position that blood tests are admissible evidence regarding the issue of nonpaternity is due to a combination of several factors.... The first and major reason is the increased scientific

---

21. *See generally* Jansma, *Family Law* at 823–24 (discussing the Lord Mansfield rule stating the presumption was created because " 'decency, morality, and policy required the law to be that a couple, after the birth of a child in wedlock, would not be heard to say that they have had no connection and their offspring [was] spurious' " (Citation omitted)).

22. *See Gomez v. Perez*, 409 U.S. 535, 93 S.Ct. 872, 35 L.Ed.2d 56 (1973) (illegitimate and legitimate children must be treated the same for purposes of child support from the father); *Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164, 92

S.Ct. 1400, 31 L.Ed.2d 768 (1972) (illegitimate children permitted recovery under worker's compensation laws); *Levy v. Louisiana*, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968) (Louisiana statute unconstitutional because it denied illegitimate children the right to recover for the wrongful death of mother); *Shelby J.S. v. George L.H.*, 181 W.Va. 154, 381 S.E.2d 269 (1989) (ten-year statute of limitations for filing paternity action invalidated); *State ex rel. S.M.B. v. D.A.P.*, 168 W.Va. 455, 284 S.E.2d 912 (1981) (three-year statute of limitations for filing paternity action for illegitimate children invalidated).

reliability of blood test results. The second reason is that the historical basis for the presumption of legitimacy was society's desire to protect children from the stigma of illegitimacy as well as to prevent illegitimate children from becoming wards of the state.... These two historical bases for opposing bastardization have been significantly vitiated given the modernization of society and legislation drafted to address the problems of bastardization. Specifically, it has been recognized that the stigma of illegitimacy is diminishing in the wake of a society which is composed of so many nontraditional households (e.g. [sic] single parents, step-parents, etc.). *See* 2 L. Wardle, C. Blakesley, J. Parker, *Contemporary Family Law: Principles, Policy and Practice,* § 9:01 at 3 (1988). Moreover, most states have statutes similar to W. Va.Code §§ 48A–6–1 to 48A–6–6 (Supp. 1989), pursuant to which paternity can be established and awards of child support and maintenance made, thereby removing the financial burden of bastardization placed on the state." *Michael K.T.*, 182 W.Va. at 402–03, 387 S.E.2d at 869–70. (Some citations omitted).

*See also State ex rel. J.L.K. v. R.A.I*, 170 W.Va. 339, 294 S.E.2d 142 (1982).

For the above reasons, we conclude that the historical rationales for preventing a putative biological father from claiming paternity over a child born to another's wife can no longer sustain the intrusion on the biological father's liberty interest.

An additional governmental interest, however, does have considerable validity in this context. Clearly, the government has a substantial interest in preserving the integrity of traditional family units and in discouraging vexatious or even good-faith suits that have a high likelihood of disrupting family life and possibly causing confusion and emotional harm to affected children. Not all petitions challenging the paternity of marital children threaten those interests, however. In the present facts, for example, the marriage into which Jennifer was born long since has been

dissolved, so Thomas's suit could hardly damage its stability or integrity.

Still, we believe governmental interests in preserving family units and their integrity warrant some measures designed to limit suits to establish paternity over marital children that would not be justified in cases involving nonmarital children. We conclude, however, that these legitimate goals cannot support the statute's complete exclusion of paternity suits by putative fathers of children born into someone else's marriage because less drastic measures are available that will fully meet the State's legitimate concerns.

■ First, the scope of the liberty itself limits the intrusion. We adopt Justice Brennan's synthesis of the relevant federal decisions [23] defining the liberty:

"[A]lthough an unwed father's biological link to his child does not, in and of itself, guarantee him a constitutional stake in his relationship with that child, such a link combined with a substantial parent-child relationship will do so. 'When an unwed father demonstrates a full commitment to the responsibilities of parenthood by "com[ing] forward to participate in the rearing of his child," ... his interest in personal contact with his child acquires substantial protection under the Due Process Clause. At that point it may be said that he "act[s] as a father toward his children." ' " *Michael H.*, 491 U.S. at 142–43, 109 S.Ct. at 2352, 105 L.Ed.2d at 118–19. (Brennan, J., dissenting). (Citations omitted).

*Accord, e.g., Weidenbacher v. Duclos,* 234 Conn. 51, 661 A.2d 988 (1995); *C.C. v. A.B.*, 406 Mass. 679, 550 N.E.2d 365 (1990). Thus, with the possible exceptions noted below, a petition by a putative biological father seeking to establish his paternity over a child who was born while the mother was married to another man may not proceed unless the putative father clearly and convincingly proves as a threshold matter that he has established a substantial paternal relationship with the child. We agree with the ratio-

---

**23.** *Lehr v. Robertson, supra; Stanley v. Illinois, supra; Caban v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979); *Quilloin v.* *Walcott,* 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978).

nale of the Massachusetts Supreme Judicial Court supporting this requirement:

"Without regard to the outcome of a paternity case, even the very trial of such a case might place great strain on a unitary family. Where, however, the plaintiff has exhibited that he has had a substantial parent-child relationship with the child, it will certainly come as no surprise to the marital family that there is a question as to paternity. If the plaintiff cannot come forward with clear and convincing evidence of such a relationship, he will not be able to proceed beyond the preliminary stages of the action. The family will be protected against significant intrusion. If, on the other hand, the putative father can demonstrate that he has enjoyed a substantial relationship with the child, then his interest warrants protection and the interest in protecting a family which, by necessary implication, has already suffered substantial interference (by the acts of one of the marital partners) is greatly decreased. In these circumstances, the putative father should be allowed to proceed with his action." *C.C. v. A.B.*, 406 Mass. at 691, 550 N.E.2d at 373.

The putative father's showing need not be made, however, if no respondent (named or intervening and including the guardian *ad litem*) contests the petition. We leave for another day whether there should be an additional exception for cases in which the petitioner alleges and proves that he would share in the care of, responsibility for, and support of the child but for the mother's repudiation. *See C.C. v. A.B.*, 406 Mass. at 690 n. 10, 550 N.E.2d at 372 n. 10.

■ Second, because a paternity action is in the nature of an equitable proceeding, as well as Rule 11 of the West Virginia Rules of Civil Procedure, a circuit court has discretion to impose attorney's fees on litigants who bring vexatious and groundless lawsuits.

Appropriate exercise of that discretion should alleviate some of the concerns about the use of paternity actions for ulterior or vindictive purposes. In addition, the support obligations that could likely attend a finding of paternity will function as a built-in deterrent to nonserious paternity actions brought by putative fathers.

■ Finally, permitting a putative father to have standing does not end the matter. Even if he proves paternity, he still is not necessarily entitled to intrude further into the marital family (if it has survived) or into existing child-parent relationships, including any relationship that has developed between the presumed father and the child. These factors may be considered in both the standing and paternity determinations. They also may have an impact on other issues the circuit court must decide. A finding of paternity would only entitle the natural father to an opportunity to request to invoke his parental rights; in response, it would remain for the circuit court to determine issues of visitation, custody, etc., based on the best interests of the child. *E.g., Michael K.T.*, 182 W.Va. at 405, 387 S.E.2d at 872; *J.M.S. v. H.A.*, 161 W.Va. at 436, 242 S.E.2d at 697. As Justice Workman stated for the Court in *Michael K.T.*, and as we have often repeated, "the best interests of the child is the polar star by which decisions must be made which affect children." 182 W.Va. at 405, 387 S.E.2d at 872. *See also* Syl. pt. 4, in part, *State ex rel. David Allen B. v. Sommerville*, 194 W.Va. 86, 459 S.E.2d 363 (1995); Syl. pt. 1, *State ex rel. Cash v. Lively*, 155 W.Va. 801, 187 S.E.2d 601 (1972).[24]

In making any of the above determinations, it would be appropriate for the circuit court to consider the impact of its order on the existing family, if there be one, or the existence of already established parent-child relationships. If the putative father's intrusion into the family, or into an established parent-child relationship, would cause undue

---

24. Permitting the putative father an opportunity to establish and assert his parental rights should not be construed in any way as an erosion of the child's right to continued association with the presumed father or others where a father-child relationship may have been established. In Syllabus Point 2 of *Honaker v. Burnside*, 182 W.Va. 448, 388 S.E.2d 322 (1989), we state: "Although custody of minor child should be with the natural parent absent proof of abandonment or some form of misconduct or neglect, the child may have a right to continued visitation rights with the stepparent or half-sibling." Thus, we expand the holding in *Honaker* to other parental relationships.

disruption and, thus, jeopardize the child's proper development, the court could consider that as a basis for denying relief. In the present case, although the family unit that existed at the time of Jennifer's birth is dissolved, it is still necessary for the circuit court upon remand to consider the existence and extent of any preexisting child-parent relationship between the presumed father and Jennifer. If such a relationship exists that would be a factor against according the putative father some access. These are all fact-specific cases, however, and require careful consideration of many issues, including the age of the child, his or her emotional maturity, the personalities of the affected individuals, their history, the wishes of the child, any prior opportunities to raise the issue of the paternity, and any other matter relevant to determining what is best for the child.

By this decision, we join an increasing number of states that have upheld the rights of putative fathers. *See Ban v. Quigley,* 168 Ariz. 196, 812 P.2d 1014 (1990), *review dismissed by* 169 Ariz. 477, 820 P.2d 643 (1991); *In the Interest of J.W.T.,* 872 S.W.2d 189 (Tex.1994); *Smith v. Jones,* 566 So.2d 408 (La.App. 1 Cir.), *writ denied sub nom., Kemph v. Nolan,* 569 So.2d 981 (La.1990); *J.W.P. v. W.W.,* 255 N.J.Super. 185, 604 A.2d 695 (1990), *aff'd,* 255 N.J.Super. 1, 604 A.2d 603 (1991); *M.J.C. v. D.J.,* 410 Mass. 389, 572 N.E.2d 562 (1991); *Van Nostrand v. Olivieri,* 427 So.2d 374 (Fla.App. 2 Dist.1983); *C.C. v. A.B., supra;* Jansma, *Family Law* at 834 and n. 45. Indeed, one court recently noted that "[a]pproximately two-thirds of the states, either by statute or judicial interpretation, now give putative fathers a right to rebut the presumption that a child born in wedlock is the issue of the marriage." *Weidenbacher v. Duclos,* 234 Conn. at 73, 661 A.2d at 999, *citing* Traci Dallas, *Rebutting the Marital Presumption: A Developed Relationship Test,* 88 Colum. L.Rev. 369, 373–74 (1988).

▮▮▮ Although we find that W. Va.Code, 48A–6–1, is, in part, unconstitutional, we rec-

ognize the importance of this statute. Therefore, rather than rendering the entire statute unenforceable, we apply the doctrine of the least intrusive remedy and hold that the Due Process Clause of the West Virginia Constitution requires courts to hear and decide, under the guidelines we set out below, paternity actions brought by a putative biological father of a child born to a married woman who is not his wife. This result is in keeping with Syllabus Point 2 of *McGuire v. Farley,* 179 W.Va. 480, 370 S.E.2d 136 (1988), which applied the doctrine in similar circumstances:

> " 'Where a statute serves an urgent and necessary public purpose but is technically deficient for constitutional reasons, this Court will apply the remedy and give the statute, wherever possible, an interpretation which will cure its defect and save it from total invalidation.' Syllabus Point 2, *Anderson's Paving, Inc. v. Hayes,* [170] W.Va. [640], 295 S.E.2d 805 (1982)."

### C.

### New Standing Requirements

▮▮▮ Given our holding that putative biological fathers can acquire a liberty interest upon developing a substantial parental relationship with a child, regardless of the mother's marital status, we believe it is appropriate for us to provide the circuit courts with guidance as to how such cases should be processed. A balance must be struck between the interests of maintaining a family unit and/or an existing father-child relationship and the legitimate interests of a putative father. Thus, we find that, in the absence of special circumstances which would justify an exception, a putative biological father must prove by clear and convincing evidence the following factors before he will have standing to raise the issue of paternity of a child born to a married woman who is not his wife: (1) that he has developed a parent-child relationship with the child in question, and (2) that the child will not be harmed by allowing the paternity action to proceed.[25] In determin-

---

**25.** Examples of factors that may be considered when conducting this two-step analysis include: (1) examining the child's current home environ- ment, (2) the on-going family relationship, (3) the child's relationship with the putative father, (4) the child's knowledge and reaction to paternity

ing whether the child will endure harm by the paternity action, it is highly relevant for the circuit court to consider on remand whether the putative father was dilatory in grasping the opportunity to assert his parental rights and responsibilities. We cannot escape the fact that the putative father testified in the underlying divorce and custody action and did not indicate at any time that he, not Roy, was the natural father of Jennifer. Unless adequately explained, his silence weighs heavily against his interest in the present action. We also require that the child must be joined in the suit and a guardian *ad litem* appointed. In addition, the preeminent factor in deciding whether to grant or deny blood testing is the child's best interests. Accordingly, the standards set forth in *Michael K.T., supra*, apply here as well:

> "We hold that when a putative father seeks to use blood test results to ... [prove] his paternity and rebut the presumption of legitimacy which has attached to a child born of a valid marriage, an *in camera* hearing should be held in order for the circuit court to make a preliminary determination whether the equities surrounding the particular facts and circumstances of the case warrant admission of blood test results." 182 W.Va. at 404, 387 S.E.2d at 870–71. (Emphasis in original).

Other jurisdictions recognizing a general right to standing for a putative biological father whose child was born to a woman married to another man apply a similar best interest analysis. In *David L. v. Cindy Pearl L.*, 208 A.D.2d 502, 617 N.Y.S.2d 57 (1994), the New York Appeals Court upheld the dismissal of a putative father's paternity proceeding because the putative father failed to raise the issue of paternity until the child was four years old and the child's best interests indicated the putative father's claim should be dismissed. The Minnesota Court of Appeals also has indicated it is imperative that a putative biological father's interests

will not be constitutionally protected if "he has failed to 'grasp the opportunity' to establish a parent-child relationship[.]" *R.B. v. C.S.*, 536 N.W.2d 634, 638 (1995). *See also W.C. In the Interest of A.M.K.*, 907 P.2d 719 (Colo.App.1995); *Weidenbacher v. Duclos, supra*. In *Turner v. Whisted*, 327 Md. 106, 116, 607 A.2d 935, 940 (1992), the court explained the justification for using this form of analysis prior to ordering blood tests instead of automatically striking the interests of the putative biological father: "We believe that a trial court ought to be able to consider and balance the different interests.... A discovery request for blood tests allows the court to weigh these competing interests. Most significantly, the determination of good cause allows the court discretion to consider the best interests of the child." *See also In re Marriage of Ross*, 245 Kan. 591, 602, 783 P.2d 331, 338 (1989) ("[p]rior to ordering a blood test to determine whether the presumed parent is the biological parent, the district court must consider the best interests of the child"); *McDaniels v. Carlson*, 108 Wash.2d 299, 309–11, 738 P.2d 254, 260–61 (1987) (when a child is presumed legitimate, the court must look to the child's best interests before ordering blood testing).

We find these preconditions balance the interests of all the parties in question. Although a parent has a protectable interest in a child, a parent's rights are not absolute: " ' "[ (t) ]he welfare of the child is the paramount consideration to which all of the factors, including common law preferential rights of the parents, must be deferred or subordinated." ' " *Johnson v. Johnson*, 120 N.C.App. 1, 13, 461 S.E.2d 369, 376 (1995), *rev'd per curiam on other grounds*, 343 N.C. 114, 468 S.E.2d 59 (1996). (Citations omitted). These limitations do not offend the Constitution. *See Ban v. Quigley, supra; McDaniels v. Carlson, supra; C.C. v. A.B., supra; Turner v. Whisted, supra; In re Marriage of Ross, supra.*

---

proceedings, (5) the putative father's attempt to become involved in the child's life, (6) whether the putative father acquiesced in allowing another to establish a father-child relationship, (7) when the putative father discovered he might be the biological father, (8) whether there is an existing child-parent relationship with the presumed father, and (9) whether ascertaining genetic information might be important for medical treatment or genealogical history. This is not an exhaustive list of factors that could be relevant. What is ultimately to be considered should be left to the discretion of the circuit court.

## III.

### CONCLUSION

 When a putative biological father raises a paternity claim, the circuit court must provide the petitioner with an opportunity to prove that he meets the threshold standards that will allow him to proceed. The threshold determinations, as well as any ultimate allocations of the parental rights, must assess the best interests of the child. The two sets of decisions, which will typically involve overlapping evidence, obviously require the exercise of sensitivity and discretion in the analysis of a range of factors that can vary widely from case to case in terms of their applicability and importance. Accordingly, the circuit court's decisions will not be reversed absent an abuse of discretion. *See generally Paternity of Adam*, 273 Mont. 351, 903 P.2d 207 (1995), *cert. denied sub nom., "Bob" v. "Mary"*, — U.S. —, 116 S.Ct. 1544, 134 L.Ed.2d 647 (1996); Deborah A. Ellingboe, Note, *Sex, Lies, and Genetic Tests: Challenging the Marital Presumption of Paternity Under the Minnesota Parentage Act,* 78 Minn. L.Rev. 1013, 1044 (1994) (best-interest type of analysis "allows the courts flexibility in dealing with modern, nontraditional families, while protecting all interested parties"). We also direct that the child in question must be joined so that his or her rights may be adequately protected.

In so holding, we do not intend, in any way, to denigrate the importance of the traditional family unit or the institution of marriage. To the contrary, we continue to believe that the family provides the foundation upon which our society is built and through which its most cherished values are best transmitted. Our disposition of this case merely recognizes the reality that nontraditional living arrangements do exist, that recognized liberty interests can arise from such arrangements, and that furtherance of the State's interest in preserving family and marital stability does not require an absolute bar to the rights of putative natural fathers.

We, therefore, grant a writ of prohibition, as moulded, and remand this case to permit the paternity action to proceed only in a manner consistent with this opinion.

Writ granted as moulded.