**No. 18-0780 --** *Michael N. v. Brandy M. and Allen M.*

**Hutchison, Justice, dissenting:**

In order to fashion a remedy for the petitioner Michael N., the majority opinion has ignored the dictates of both the West Virginia Legislature and this Court's decision in *State ex rel. Roy Allen S. v. Stone*, 196 W.Va. 624, 474 S.E.2d 554 (1996). Most importantly, the majority has failed to adequately consider the very real harm that the decision to allow this paternity action could inflict on the lives of these children.

West Virginia Code § 16-5-10(f) (2006) directs that if a mother is married at the time her child is conceived or born, her husband's name shall be entered on the birth certificate as the child's father.[1] Brandy M. and Allen M. were married at the time of the conception and birth of both of these children, and Allen M. is listed as the father on their

---

[1] West Virginia Code § 16-5-10(f)(1) provides:

> (f) If the mother was married at the time of either conception or birth, or between conception and birth, the name of the most recent husband shall be entered on the certificate as the father of the child, unless:
>
> (1) Paternity has been determined otherwise by a court of competent jurisdiction pursuant to the provisions of article twenty-four, chapter forty-eight of this code or other applicable law, in which case the name of the father as determined by the court shall be entered on the certificate; . . . .

This statute goes on in subdivisions (f)(2) and (f)(3) to provide other avenues for specifying paternity on a birth certificate, but those provisions do not apply in this case. *See* W.Va. Code § 16-5-10(f)(5).

1

birth certificates. Pursuant to this statute, a person must comply with the directives of chapter forty-eight, article twenty-four of the West Virginia Code to establish paternity in someone else. *Id.*[2]

As the majority opinion discusses, West Virginia Code § 48-24-101(e) (2002) specifically lists who has standing to file an action to establish paternity. Notably absent from the list is a putative biological father who seeks to establish his paternity of a child born to a woman who is married to another man. Prohibiting standing in such situations was a policy decision made by the Legislature. Regardless of whether I or other members of this Court may agree or disagree with this policy choice, we are duty bound as justices to apply a statute as written unless it is unconstitutional:

> This Court does not sit as a superlegislature, commissioned to pass upon the political, social, economic or scientific merits of statutes pertaining to proper subjects of legislation. It is the duty of the Legislature to consider facts, establish policy, and embody that policy in legislation. It is the duty of this Court to enforce legislation unless it runs afoul of the State or Federal *Constitutions*.

Syl. Pt. 2, *Huffman v. Goals Coal Co.*, 223 W.Va. 724, 679 S.E.2d 323 (2009).

In order to reach a result favorable to the petitioner, the majority opinion relies upon a very narrow exception to the standing requirement that was carved out in

---

[2] *See supra* n. 1.

*Stone*. Specifically, the *Stone* Court declared that West Virginia Code § 48-24-101(e)[3] is unconstitutional as applied to a putative father who proves by clear and convincing evidence that he has *already established a substantial parental relationship with the child*, and the child would not be harmed by allowing the paternity action to proceed. *See* Syl. Pts. 3 & 6*, Stone*. The *Stone* Court concluded that in those very narrow circumstances, the standing statute violated the putative biological father's right to Due Process under the West Virginia Constitution, article III, section 10.

Critically, the petitioner herein has *not* already established a substantial relationship with these children. At most, he spent a few months with O.M. while the child was an infant, and he has never seen E.M. The *Stone* Court expressly "[left] for another day" the question of whether there should be an additional constitutional exception created for a putative father who alleges and proves that he would have developed such a relationship with a child but for the mother's repudiation of him. 196 W.Va. at 636, 474 S.E.2d at 566. Thus, although *Stone* expressly does not apply to the facts as alleged by Michael N., the majority opinion has gone ahead and applied it anyway.[4]

---

[3] When *Stone* was decided, this statute was codified at West Virginia Code § 48A-6-1(e).

[4] The majority opinion also makes the confusing statement that because of the disposition of the petitioner's first assignment of error, which addressed standing under the statute, the majority of the Court did "not find it necessary to consider the second assignment of error" regarding the petitioner's contention that the circuit court did "not adequately consider[] his constitutional rights[.]" *See* Slip Op. p. 12. However, the only

3

Furthermore, when declaring West Virginia Code § 48-24-101 partly unconstitutional, the *Stone* Court recognized that "[m]erely identifying that a law affects an individual liberty is not the end of the matter; our doctrines permit the State to intrude upon liberties protected by the Due Process Clause when reasonably necessary to accomplish a goal of countervailing importance." 196 W.Va. at 633, 474 S.E.2d at 563. Obviously, one of the legislative goals of the statute requiring that the husband's name be listed on the birth certificate, and of the statute denying a putative biological father standing to challenge paternity when the child was born during the mother's marriage to another man, is the protection of an existing family unit. Another obvious goal is the protection of the child's welfare and best interests. "[T]he primary goal . . . in all family law matters, must be the health and welfare of the children." Syl. Pt. 3, in part, *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996); *Michael K.T. v. Tina L.T.*, 182 W.Va. 399, 405, 387 S.E.2d 866, 872 (1989) (recognizing that "the best interests of the child is the polar star by which decisions must be made which affect children").

In my opinion, *Stone* has gone as far on this issue as our Court should go. Given the social policy issues involved, if there are to be additional exceptions to the standing statute, the Legislature and not this Court should create them. It is notable that the Legislature has amended West Virginia Code § 48-24-101 in the years since *Stone* was decided, but this restriction on standing remains unchanged.

---

way that the petitioner could have standing in contravention of West Virginia Code § 48-24-101 would be to declare the statute unconstitutional as applied to him.

4

Even assuming *arguendo* that the holding in *Stone* did apply to this case, it is important to remember that there are two parts to the *Stone* test. To obtain paternity testing, the putative biological father must prove by clear and convincing evidence the existence of a substantial relationship with the child *and* that testing is in the best interests of the child. Syllabus point 7 of *Stone* provides:

> When a putative biological father raises a paternity claim, the child must be joined and a guardian *ad litem* appointed. The circuit court should conduct a preliminary hearing to determine whether the requisite preconditions are present. *In addition, the preeminent factor in deciding whether to grant or deny blood testing is the child's best interests.* The analysis of each factual situation is necessarily a discretionary decision for the circuit court, and the finding by the circuit court will not be reversed absent an abuse of discretion.

(Emphasis added). The recognition of a putative parent's biological relationship must never be done at the expense of a child's best interests. This is why Justice Cleckley, when authoring *Stone*, set forth several factors in footnote 25 that a court could consider when deciding whether to allow paternity testing:

> Examples of factors that may be considered when conducting this two-step analysis include: (1) examining the child's current home environment, (2) the on-going family relationship, (3) the child's relationship with the putative father, (4) the child's knowledge and reaction to paternity proceedings, (5) the putative father's attempt to become involved in the child's life, (6) whether the putative father acquiesced in allowing another to establish a father-child relationship, (7) when the putative father discovered he might be the biological father, (8) whether there is an existing child-parent relationship with the presumed father, and (9) whether ascertaining genetic information might be important for medical treatment or genealogical history. This is not an exhaustive list of factors that could be relevant. What is

5

> ultimately to be considered should be left to the discretion of the circuit court [now family court].

196 W.Va. at 637 n.25, 474 S.E.2d at 567 n.25. These are factors for consideration when deciding whether to allow paternity testing, not simply when deciding, post-testing, whether a man who is determined to be the biological father should receive custody or visitation. *Id.*

The majority opinion has given little consideration to the impact that this paternity action might have on these children. The majority opinion purports to be remanding the matter for the family court to hold a hearing on the children's best interests, but the family court has *already* held an evidentiary hearing and has *already* made findings on this issue. After making those findings, the family court ordered the paternity testing to go forward; it was only halted when the circuit court granted a writ of prohibition.

After considering the factors suggested in *Stone* footnote 25, I am convinced that it would not be in the best interests of these children to allow the petitioner to pursue this paternity action. Once testing is performed, the "bell cannot be unrung." It will upend the children's current home environment, lives, and their ongoing relationship with Allen M.—who is the only father they have ever known—if they are told that Allen M. might not

be their dad, or if they are forced to travel across the country to visit a man whom they do not know.[5]

The family court did "not believe it contrary to the best interests of the minor children to be loved by as many caretakers as may be willing," but this platitude obviously does not always hold true, particularly when children are at the center of a contentious dispute. The family court also decided that Brandy and Allen M.'s family life would not be rendered "less harmonious" because there had already been at least two periods of separation between them in the past (when Brandy went to Arkansas). However, that finding only addresses the impact on the adults, not on the children. One child was an infant, and one child was not even born, when Brandy M. spent that time in Arkansas, therefore those periods of separation are irrelevant to an evaluation of the impact upon the children. Instead of focusing on the rights of the adult, the best interests analysis requires a court to focus on the children. I agree with the circuit court's observations in its August 9, 2018, order:

> [The petitioner] has requested paternity testing as a predicate for arguing an allocation of custodial responsibility. In the proposed parenting plan submitted originally with the petition in this matter [the petitioner] outlines what he believes is appropriate contact with the children. Along with the contact comes a significant disruption of the only family these two children have known. The travel arrangements, periods of visitation, and holiday visits will have a substantial impact on the children. After a period of two years absence, allowing [the

---

[5] In his petition to establish paternity, the petitioner submitted a proposed plan for allocation of custodial responsibility.

petitioner] to interfere with the children's situation will undoubtedly adversely impact the goal of the children's stability, certainly, and security—physically, psychologically, and emotionally[.]

For all of the reasons set forth herein, I respectfully dissent.