# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

## January 2020 Term

_____

No. 18-0780

_____

**FILED**
**June 17, 2020**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

Michael N.,
Petitioner Below, Petitioner

V.

Brandy M. and Allen M.,
Respondents Below, Respondents

_____

Appeal from the Circuit Court of Randolph County
The Honorable David H. Wilmoth, Judge
Civil Action No. 16-D-223

**REVERSED AND REMANDED WITH DIRECTIONS**
_____

Submitted: February 11, 2020
Filed: June 17, 2020

Samantha L. Koreski
Linda Hausman
Kaufman & McPherson, PLLC
Bridgeport, West Virginia
Attorneys for the Petitioner

Timothy H. Prentice
Prentice Law Office
Elkins, West Virginia
Guardian Ad Litem
for the minor children

David C. Fuellhart, III
Isner Law Office
Elkins, West Virginia
Attorney for the Respondents

JUSTICE JENKINS delivered the Opinion of the Court.

**CHIEF JUSTICE ARMSTEAD and JUSTICE HUTCHISON** dissent and reserve their rights to file separate opinions.

**SYLLABUS BY THE COURT**

1.      "In reviewing a final order entered by a circuit court judge upon a review of, or upon a refusal to review, a final order of a family court judge, we review the findings of fact made by the family court judge under the clearly erroneous standard, and the application of law to the facts under an abuse of discretion standard.  We review questions of law *de novo*."  Syllabus, *Carr v. Hancock*, 216 W. Va. 474, 607 S.E.2d 803 (2004).

2.      "Although an unwed father's biological link to his child does not, in and of itself, guarantee him a constitutional stake in his relationship with that child, such a link combined with a substantial parent-child relationship will do so.  When an unwed father demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child, his interest in personal contact with his child acquires substantial protection under the Due Process Clause in Section 10 of Article III of the West Virginia Constitution."  Syllabus point 2, *State ex rel. Roy Allen S. v. Stone*, 196 W. Va. 624, 474 S.E.2d 554 (1996).

3.      "A putative biological father must prove by clear and convincing evidence the following factors before he will have standing to raise the issue of paternity of a child born to a married woman who is not his wife: (1) that he has developed a parent-child relationship with the child in question, and (2) that the child will not be harmed by

i

allowing the paternity action to proceed." Syllabus point 6, *State ex rel. Roy Allen S. v. Stone*, 196 W. Va. 624, 474 S.E.2d 554 (1996).

4.      "In the absence of special circumstances which would justify an exception, a petition by a putative biological father seeking to establish his paternity over a child who was born while the mother was married to another man may not proceed unless the putative father clearly and convincingly proves as a threshold matter that he has established a substantial paternal relationship with the child. The putative father's showing need not be made, however, if no person or party (named or intervening and including the guardian *ad litem*) contests the petition." Syllabus point 3, *State ex rel. Roy Allen S. v. Stone*, 196 W. Va. 624, 474 S.E.2d 554 (1996).

5.      "When a putative biological father raises a paternity claim, the child must be joined and a guardian *ad litem* appointed. The circuit court should conduct a preliminary hearing to determine whether the requisite preconditions are present. In addition, the preeminent factor in deciding whether to grant or deny blood testing is the child's best interests. The analysis of each factual situation is necessarily a discretionary decision for the circuit court, and the finding by the circuit court will not be reversed absent an abuse of discretion." Syllabus point 7, *State ex rel. Roy Allen S. v. Stone*, 196 W. Va. 624, 474 S.E.2d 554 (1996).

**Jenkins, Justice:**

This is an appeal of an order entered August 9, 2018, in the Circuit Court of Randolph County, which affirmed a family court order dismissing a petition to establish paternity and allocate custodial responsibility filed by Petitioner Michael N. ("Michael").[1] Michael filed a petition seeking genetic testing to establish paternity and to potentially allocate custodial responsibility. Respondents Brandy M. ("Brandy") and Allen M. ("Allen") (collectively "Respondents") opposed the petition. Following an evidentiary hearing, the Family Court of Randolph County issued an order directing paternity testing. Prior to any genetic testing, the Respondents sought and were granted a writ of prohibition by the Circuit Court of Randolph County prohibiting the enforcement of the family court's order granting genetic testing because it found Michael lacked standing to initiate the paternity action. Pursuant to the circuit court's order, the family court dismissed Michael's petition. Subsequently, Michael appealed the matter to the circuit court where the dismissal was upheld.

On appeal to this Court, Michael first asserts that the lower courts erred in finding that he lacked standing to initiate a paternity action. He further contends that the lower courts erred by not adequately considering his constitutional rights. Having reviewed the briefs submitted on appeal, the appendix record, the parties' oral arguments,

---

[1] It is this Court's customary practice in cases involving sensitive facts to refer to parties by their initials rather than by their given names. *See In re Jeffrey R.L.*, 190 W. Va. 24, 26 n.1, 435 S.E.2d 162, 164 n.1 (1993).

1

and the applicable legal authority, this Court reverses the final order of the Circuit Court of Randolph County, and remands this matter to permit the paternity action to proceed in a manner consistent with this opinion.

## I.

## FACTUAL AND PROCEDURAL HISTORY

Brandy and Allen were married on July 28, 2012. Both Brandy and Allen contend that they have been married continuously since 2012 and were residents of Randolph County, West Virginia, during the pendency of the underlying matter. However, "[o]n various occasions throughout the course of the marriage, the couple lived apart, as [Brandy] spent time in or near Green Forest, Arkansas, ostensibly for the purpose of visiting family."[2] It is undisputed that during these visits to Arkansas, Michael and Brandy engaged in an intimate and sexual relationship. In September of 2014, Brandy gave birth to a child, O. M., in West Virginia.[3] In February of 2015, Brandy and O. M. traveled to Arkansas. Michael spent time with Brandy and O. M. between February and April of 2015 and again in November and December of 2015 when Brandy and O. M. returned to

---

[2] Brandy maintains that she was simply visiting family during this time. However, Michael asserts that Brandy and Allen were separated.

[3] This Court notes that O. M. has an unusual first name. Furthermore, it is undisputed that Michael's grandfather shares the same unusual name. In an effort to dispute Michael's paternity, Brandy attempted to explain away the fact that O. M. shared Michael's grandfather's unusual name; however, the family court did not find this explanation to be credible.

Arkansas. During each of these periods of time, Michael "asserts he performed significant caretaking duties and assumed certain financial responsibilities, i.e. [sic], [purchasing] diapers, clothing, and child care items." Michael further contends that "he maintained contact with Brandy [] after she returned to West Virginia with the minor child O. M. and he received information concerning the child's development and growth continually until September [of] 2016," at which time Brandy gave birth to a second child, E. M., in West Virginia, a fact unknown to Michael.[4] After September of 2016, Michael had no further contact with O. M. Michael alleges that he "attempted to exercise greater contact with [O. M.] and offered to provide additional financial support, but was refused that opportunity by [Brandy]."

Following Brandy's cut-off of all contact with O. M., Michael immediately filed a petition in October of 2016, to establish paternity and to allocate custodial responsibility of the minor child, O. M. In his petition, Michael alleged that Brandy had separated from her husband Allen for a period of time in October of 2013. During this time, Brandy relocated to Arkansas to live with relatives. Michael contended that he engaged in an intimate, sexual relationship with Brandy from October of 2013 to January of 2014. In January of 2014, Brandy informed Michael that she was pregnant and, shortly thereafter, returned to West Virginia where she reconciled with her husband. During the

---

[4] The family court noted that Michael testified that Brandy "called him during her pregnancy and specifically advised that she was not pregnant."

3

pregnancy, Brandy corresponded with Michael, including "sending him ultrasound photos[.]" In February of 2015, following the birth of the minor child, Brandy once again returned to Arkansas. During this time, Brandy and O. M. lived with Michael for approximately two months. Petitioner asserted that he administered a "drug store" paternity test, and the results indicated he was the father of O. M. with 99.9% certainty. Brandy then returned to West Virginia in the "[s]pring of 2015." Michael further contended that Brandy and O. M. returned to Arkansas in November of 2015 and lived with him for another month. Michael and his mother drove Brandy back to West Virginia in December of 2015 "with the understanding that she would return to Arkansas after the Christmas holiday."[5] Michael alleged that he "has asked [Brandy] repeatedly to allow him to see the minor child [O. M.,]" but has been consistently denied contact. Finally, Michael argued that "[i]t is in the best interest of the parties' minor child for paternity to be conclusively established[.]"

Subsequently, Michael filed an amended petition on November 14, 2016, seeking also to establish paternity as to the minor child E. M. This petition also sought an allocation of parenting time with the two minor children were he determined to be the biological father. In regard to the amended petition, Michael alleged that Brandy concealed

---

[5] Both Brandy and Allen have children from previous relationships. It is unclear from the record before us how much time these other children spend with Respondents as opposed to their other respective parents. Accordingly, it appears that Brandy was returning to West Virginia to visit with her other child(ren).

4

the second pregnancy from him and asserted he was also the father of minor child E. M. In response, the Respondents filed a motion to dismiss the petition due to Michael's lack of standing. The Respondents asserted that it was undisputed that they were married at the time O. M. and E. M. were born. Further, according to the Respondents, Michael failed to allege that he developed a parent-child relationship with O. M. Respondents also argued that Michael had never met E. M. Finally, Respondents alleged that Michael failed to address the potential harm to the minor children and asserted that uprooting the children from their current family situation would cause them substantial harm.

The family court held an initial hearing in January of 2017 and appointed a guardian ad litem for the children. Subsequently, in April of 2017, the family court held an evidentiary hearing on Michael's petition. The family court heard the testimony of the parties, as well as two witnesses on Michael's behalf.[6] In its order, the family court agreed with Michael's timeline of events.[7] The family court found Michael's testimony regarding

---

[6] Additionally, the following evidence was introduced and made a part of the record below (however, it was not included in the appendix before us): photographs of Michael and O. M., and text messages exchanged between Michael and Brandy. According to the family court, Michael testified that "he exchanged in excess of forty-six thousand Facebook messages with [Brandy], in addition to text messages, Snapchat messages, and telephone calls. [Brandy] did not contradict this testimony, although she could not recall the exact number of messages exchanged."

[7] The family court noted that from February of 2015 to April of 2015, Michael saw O. M. "at least once per day for several hours." During this time, he "participated in caretaking for the minor child, including, but not limited to, bottle feedings and diaper changes." Additionally, from November of 2015 to late December of 2015, Michael saw O. M. on a daily basis and "participated in caretaking functions for the minor child, including, but not limited to, bottle feedings, diaper changes, bathing, assisting with

his relationship with Brandy to be credible. Ultimately, the family court considered the test for standing laid out in *State ex rel. Roy Allen S. v. Stone*, 196 W. Va. 624, 474 S.E.2d 554 (1996).[8] The family court further considered certain language in that opinion—whether there should be an exception to the general rule for "cases in which the petitioner alleges and proves that he would share in the care of, responsibility for, and support of the child *but for* the mother's repudiation." *Stone*, 196 W. Va. at 636, 474 S.E.2d at 566 (emphasis added). According to the family court, Michael "grasped the opportunity to establish a parent/child relationship when the Respondent mother was not interfering." The family court concluded that Michael would have continued to share in the parenting responsibilities if not for Brandy's refusal. It further noted that Respondents also had children from other relationships and that Allen shared custody of one child with her mother. Based on this arrangement, the family court found Respondents' argument that

---

the child's bedtime and wake-up routines." The family court stated that when O. M. was in Arkansas, Michael "provided financial support for the minor child in the form of diapers, clothing, and other child care items." It further noted that Michael testified that "he offered to provide additional financial support for the minor child [O. M.]; however, [Brandy] advised that she did not want the support."

[8] This Court has stated the test for standing as follows:

> A putative biological father must prove by clear and convincing evidence the following factors before he will have standing to raise the issue of paternity of a child born to a married woman who is not his wife: (1) that he has developed a parent-child relationship with the child in question, and (2) that the child will not be harmed by allowing the paternity action to proceed.

Syl. pt. 6, *State ex rel. Roy Allen S. v. Stone*, 196 W. Va. 624, 474 S.E.2d 554 (1996).

6

genetic testing would be "disruptive to their family unit" to be disingenuous. Ultimately, the family court found *Stone* to be inapplicable to the case due to Brandy's rejection of Michael's attempt to create a parent-child relationship. Accordingly, the family court ordered genetic testing.

Following the order for genetic testing, Respondents filed a petition for a writ of prohibition in the circuit court. Respondents argued that the family court exceeded its legitimate powers in granting genetic testing. Petitioner filed a response. The circuit court entered a "Rule to Show Cause/Stay of Family Court Order Pending Further Hearing," which stayed the proceedings, and, thereafter, held a hearing and heard arguments on the matter. Ultimately, the circuit court granted the writ of prohibition in February of 2018. In doing so, the circuit court reasoned that, under West Virginia law, a child born during the course of a marriage is presumed to be a child of that marriage. The circuit court concluded that Michael did not attempt to establish the factors provided in *Stone*. Rather, the circuit court found that Michael relied upon a potential exception mentioned in *Stone*. Based on this showing, the family court found that *Stone* did not apply. The circuit court explained that the family court's finding that the *Stone* test did not apply clearly exceeded its authority because this Court had not yet found that to be an acceptable exception. Therefore, the circuit court granted the writ of prohibition and remanded the case to the family court.

On remand, the family court reluctantly entered an order in May of 2018 that dismissed Michael's petition for genetic testing. In its order, the family court noted that the parties filed a joint motion to the circuit court for clarification of the circuit court's order granting the writ of prohibition. The circuit court's subsequent response was "a short, one sentence [o]rder, stating that its previous [o]rder was a [f]inal [o]rder." Prior to dismissing the petition, the family court made several findings. First, the family court found that the paternity establishment statute attempted to limit a class of "vexatious litigants" and "insulate a nuclear, harmonious family." The family court reasoned that Michael did not file his petition for a vindictive or vexatious purpose. Further, the family court found that if Michael were permitted to proceed in his action, Respondents' family would not be rendered less harmonious, based in particular on at least two periods of separation between Respondents that allegedly gave rise to the conception of the minor children.[9] Additionally, the family court found that Michael's "attempts [in carrying out his parental responsibilities] were thwarted by the [r]espondent mother" and that he was not permitted "an opportunity to establish a parent/child relationship" with the children.[10]

---

[9] To the extent that Respondents noted an objection below to any findings or conclusions in this family court order that paternity testing is in the best interests of the children, Respondents did not actually appeal or cross-appeal any of the family court's findings of fact or conclusions of law in either the circuit court or to this Court. *See* W. Va. R. Prac. & Proc. For Fam. Ct. 28(f) ("Within fifteen days after the filing of the petition for appeal, the respondent may file a cross-petition for appeal. The cross-petition may be filed in addition to any response.").

[10] While Respondents did note their objection in both the family court and the circuit court to the family court's ruling in this order that such conduct occurred,

8

The family court asserted that the issue was ripe "for a ruling from [this Court], particularly the issue of a putative father's[11] due process rights and the constitutionality of the paternity statute." (Footnote added). The family court further opined that "[t]he instant case is the embodiment of special circumstances which would justify an exception" to the *Stone* rule. However, based on the circuit court's granting of the writ of prohibition, the family court dismissed Michael's petition. Michael appealed this order to the circuit court.

On appeal to the circuit court, Michael presented two issues: 1) whether the family court abused its discretion in applying the *Stone* test and 2) whether the family court erred in not adequately weighing his constitutional rights prior to dismissing the petition. The Respondents opposed the appeal. In response to the first assignment of error, the circuit court found no abuse of discretion in the family court's application of the *Stone* test. The circuit court reasoned that the minor children were born during the marriage of Respondents and, pursuant to West Virginia law, were presumed to be the children of Allen. The only avenue by which Michael could establish standing to challenge the paternity of the children was through the *Stone* test. Application of that test to the facts of

Respondents did not actually appeal or cross-appeal any of the family court's findings of fact or conclusions of law in either the circuit court or to this Court. *See supra* note 9.

[11] For the purposes of this opinion we define "putative father" as "[t]he alleged biological father of a child born out of wedlock." FATHER, Black's Law Dictionary 751 (11th ed. 2019).

9

this case was therefore not an abuse of discretion. The circuit court also found that the family court adequately considered petitioner's constitutional rights through the application of the *Stone* test.

The circuit court considered that *Stone* recognizes "that a father has a liberty interest in maintaining an established parent-child relationship" and that "where a biological father has made a 'substantial' personal investment in his relationship with his child he acquires a liberty interest in maintaining that relationship." *Stone*, 196 W. Va. at 633, 474 S.E.2d at 564. However, it distinguished *Stone* from the facts of this case. The circuit court considered the *Stone* language, on which both Michael and the family court relied, and concluded that no additional exception was necessary in this case. In doing so, the circuit court examined a number of factors. First, the best interests of the child are the "polar star" by which decisions affecting children should be made. Michael requested paternity testing and an allocation of parenting time, but, as the circuit court observed, such allocation would come at a significant disruption to the children. The circuit court found that this would "undoubtedly adversely impact the goal of the children's stability, certainty, and security[.]"

Second, the circuit court considered that *Stone* recognized the importance of preserving the integrity of the traditional family unit: "If the putative father's intrusion into the family, or into an established parent-child relationship, would cause undue disruption and, thus, jeopardize the child's proper development, the court could consider that as a

10

basis for denying relief." *Id.* at 636-37, 474 S.E.2d at 566-67. The circuit court acknowledged that Respondents' family consisted of children from prior relationships and "the two children affected by this case do not currently face those obstacles. Nor have they been exposed to questions of whether the only Dad they have known is indeed their biological father."

Third, the circuit court noted that, while *Stone* identifies the constitutional rights of a putative biological father, "the same could be said of the legal father as well." "Remembering that biology alone does not provide the constitutional protection sought, a legal father who has otherwise met the same criteria [as set forth in *Stone*] could have the same or similar rights." However, the final analysis rests on the best interests of the children, "superior to any other concern[.]"

Finally, the circuit court found that "[Michael] does not come to this court with clean hands." Notably, Michael was aware that Brandy was married to another man at the time he engaged in an intimate relationship with her. "Although he argues he believed [Brandy] intended to divorce [Allen], when it became obvious that was not her intention, [Michael] still chose to participate [in the relationship] once again." The circuit court asserted that Michael did not respect the relationship of the Respondents and now "disregards any risk of emotional or psychological harm to these children by asserting a claim of paternity" after his extended absence. Based on the foregoing reasons, the circuit court denied Michael's appeal by order entered August 8, 2018. Michael now appeals.

11

## II.

## STANDARD OF REVIEW

Michael asks this Court to review a final decision by the Circuit Court of Randolph County, denying his petition for appeal and affirming the family court's order denying his petition seeking genetic testing to establish paternity and potentially allocate custodial responsibility. Our standard of review of the circuit court's order is well-settled:

> In reviewing a final order entered by a circuit court judge upon a review of, or upon a refusal to review, a final order of a family court judge, we review the findings of fact made by the family court judge under the clearly erroneous standard, and the application of law to the facts under an abuse of discretion standard. We review questions of law *de novo*.

Syl., *Carr v. Hancock*, 216 W. Va. 474, 607 S.E.2d 803 (2004). With this standard in mind, we now address the parties' arguments.

## III.

## DISCUSSION

On appeal, Michael raises two assignments of error. First, Michael asserts that the circuit court erred by affirming the ruling of the family court in finding that he lacked standing to initiate a paternity action. Second, Michael contends that the circuit court erred by not adequately considering his constitutional rights in affirming the family court's ruling. However, because of our disposition of the first issue, we do not find it necessary to consider the second assignment of error.

12

As stated above, in his first assignment of error, Michael asserts that the circuit court erred by affirming the ruling of the family court in finding that he lacked standing to initiate a paternity action. [12]  Conversely, Respondents contend that the lower courts were correct in dismissing Michael's petition for lack of standing. [13]

Initially, Michael concedes that he "is not afforded standing through W. Va. Code § 48-24-101(e);" however, he "asserts that he is afforded standing through prevailing West Virginia case law." [14]  West Virginia Code section 48-24-101 provides a list of all

---

[12] The children's guardian ad litem filed a response brief in this matter. Specifically, the guardian ad litem argued that "[t]he rights of the children herein are best promoted by achieving permanency and finality with regard to paternity and the other issues necessarily implicated by this case."  The guardian ad litem asserts that Michael lacks statutory standing to pursue the paternity case and that the fact pattern in this case does not present any special circumstances.

[13] In their brief to this Court, Respondents did "concede that it would be possible to make an exception to the first factor of [*Stone*] in a case where the mother prevents the putative father from developing a substantial parent-child relationship[;]" however, Respondents assert that it should not be created under the facts and circumstances of this case.

[14] As this Court has explained,

> [u]nder the common law, a child born to a married woman was presumed to be the product of the marriage, and her husband was the presumed father.  The presumption could be overcome only by proof of the husband's absence or impotence and could not be assailed at all by individuals outside the marriage. *Michael K.T. v. Tina L.T.*, 182 W. Va. 399, 387 S.E.2d 866 (1989). W. Va. Code, 48A-6-1, *et seq.*, [now W. Va. Code § 48-24-101] which modified some aspects of the common law, permits a putative biological father to bring a paternity action only if the child has no presumed father.  Other parties, however, including the husband, wife,

13

individuals/entities who are statutorily entitled to bring a paternity proceeding. *See* W. Va.

Code § 48-24-101(e) (LexisNexis 2015).[15]  Absent from this list of individuals/entities is

child, and the State, may have standing to initiate a paternity action, even though the child was born in wedlock, and may use such action to require a putative biological father who is not married to the mother to honor child support obligations.

*Stone*, 196 W. Va. at 630-31, 474 S.E.2d at 560-61.

[15] Pursuant to the statute, the following are the only individuals/entities that are authorized to initiate a paternity proceeding:

(1) An unmarried woman with physical or legal custody of a child to whom she gave birth;

(2) A married woman with physical or legal custody of a child to whom she gave birth, if the complaint alleges that:

(A) The married woman lived separate and apart from her husband preceding the birth of the child;

(B) The married woman did not cohabit with her husband at any time during such separation and that such separation has continued without interruption; and

(C) The respondent, rather than her husband, is the father of the child;

(3) The State of West Virginia, including the Bureau for Child Support Enforcement;

(4) Any person who is not the mother of the child but who has physical or legal custody of the child;

(5) The guardian or committee of the child;

(6) The next friend of the child when the child is a minor;

14

an individual who believes he is the father of a child born to a woman who was married to another man at the time of the child's birth.

However, in 1996, this Court had the opportunity to generally examine and address what was constitutionally required for a putative biological father to have standing to raise the issue of paternity of a child born to a married woman who was not his wife. Specifically, in *Stone*, we found that West Virginia Code section 48A-6-1, in part,[16] violated the Due Process Clause in Section 10 of Article III of the West Virginia Constitution. 196 W. Va. at 637, 474 S.E.2d at 567. Similar to the matter *sub judice*, in *Stone*, "[a]t the center of th[e] controversy [wa]s the question whether a person claiming to be the biological father of a child may raise the issue of paternity if the child was born during a valid marriage between the mother and another man." *Stone*, 196 W. Va. at 628, 474 S.E.2d at 558. After examining the statutory language, the *Stone* Court concluded that it did not explicitly name a putative biological father of a child born to a married

---

(7) By the child in his or her own right at any time after the child's eighteenth birthday but prior to the child's twenty-first birthday; or

(8) A man who believes he is the father of a child born out of wedlock when there has been no prior judicial determination of paternity.

W. Va. Code § 48-24-101(e).

[16] This statutory provision is the former version of our current statute, West Virginia Code section 48-24-101. While the language of the statutes is slightly different, the differences are not substantive.

15

mother and no arguments persuaded it to conclude that "the Legislature intended W. Va. Code, 48A-6-1(e), to allow *sub silentio* standing to an alleged biological father other than explicitly provided therein." *Id.* at 630, 474 S.E.2d at 560.

This Court then went on to consider whether the statute violated the putative biological father's due process rights. In so doing, we explained that

> [a] longstanding line of cases at the federal level and in West Virginia, as well as in other state courts, recognizes that "liberty" within the meaning of the Due Process Clause embraces the rights of parenthood, and that umbrella includes a parent's right to establish and preserve relationships with his or her children, even if they are born outside the traditional family.

*Id.* at 631, 474 S.E.2d at 561 (footnote omitted). Therefore, this Court found that "where a biological father has made a 'substantial' personal investment in his relationship with his child, he acquires a liberty interest in maintaining that relationship." *Id.*

However, we did not find this liberty interest to be absolute: "Still, we believe governmental interests in preserving family units and their integrity warrant some measures designed to limit suits to establish paternity over marital children that would not be justified in cases involving nonmarital children." *Id.* at 635, 474 S.E.2d at 565. Nevertheless, we went on to state "that these legitimate goals cannot support the statute's complete exclusion of paternity suits by putative fathers of children born into someone else's marriage because less drastic measures are available that will fully meet the State's legitimate concerns." *Id.* We further concluded "that the historical rationales for

16

preventing a putative biological father from claiming paternity over a child born to another's wife can no longer sustain the intrusion on the biological father's liberty interest." *Id.*

In consideration of the holding in *Stone* and in an attempt to balance the rights and interests of all involved, the Court enumerated standards for finding standing of a putative biological father to establish the paternity of a child born to a married woman who is not his wife. In enumerating such standards, we explained in Syllabus point 2 of *Stone* that,

> [a]lthough an unwed father's biological link to his child does not, in and of itself, guarantee him a constitutional stake in his relationship with that child, such a link combined with a substantial parent-child relationship will do so. *When an unwed father demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child, his interest in personal contact with his child acquires substantial protection under the Due Process Clause in Section 10 of Article III of the West Virginia Constitution.*

Syl. pt. 2, *Stone*, 196 W. Va. 624, 474 S.E.2d 554 (emphasis added). Furthermore, in Syllabus point 6 of *Stone* we held that:

> A putative biological father must prove by clear and convincing evidence the following factors before he will have standing to raise the issue of paternity of a child born to a married woman who is not his wife: (1) that he has developed a parent-child relationship with the child in question, and (2) that the child will not be harmed by allowing the paternity action to proceed.

Moreover, in Syllabus point 3 of *Stone*, this Court explained its reasoning for the application of the general two prerequisites to standing:

17

*In the absence of special circumstances which would justify an exception*, a petition by a putative biological father seeking to establish his paternity over a child who was born while the mother was married to another man may not proceed unless the putative father clearly and convincingly proves as a threshold matter that he has established a substantial paternal[17] relationship with the child. The putative father's showing need not be made, however, if no person or party (named or intervening and including the guardian *ad litem*) contests the petition.

Syl. pt. 3, *Stone*, 196 W. Va. 624, 474 S.E.2d 554 (emphasis added) (footnote added). This Court specifically was cognizant of a potential exception for cases "in which the petitioner alleges and proves that he would share in the care of, responsibility for, and support of the child but for the mother's repudiation." *Id.* at 636, 474 S.E.2d at 566. Additionally, Syllabus point 7 of *Stone* provides as follows:

---

[17] In *Stone*, the Court used both "paternal relationship" and "parent-child relationship." While we take these terms to essentially mean the same, to the extent *Stone* made a distinction between the two, we adopt the same distinction.

Furthermore, in Syllabus point 6 of *State ex rel. Jeanne U. v. Canady*, 210 W. Va. 88, 554 S.E.2d 121 (2001), we further explained the role of the generally required "substantial relationship":

The "substantial relationship" inquiry serves a dual role in evaluating issues of paternity and appropriate visitation rights. It serves a gatekeeping role in determinations regarding a putative father's standing to raise the issue of paternity and must be proven as a prerequisite to permitting the action by the putative father, as explained in *State ex rel. Roy Allen S. v. Stone*, 196 W.Va. 624, 474 S.E.2d 554 (1996). Additionally, the existence of such a relationship serves as an issue to be examined with regard to the best interests of the child. In such best interest analysis, the existence of a substantial relationship would be one of many factors to be evaluated, significant but not dispositive.

18

When a putative biological father raises a paternity claim, the child must be joined and a guardian *ad litem* appointed. The circuit court[18] should conduct a preliminary hearing to determine whether the requisite preconditions are present. In addition, the preeminent factor in deciding whether to grant or deny blood testing is the child's best interests. The analysis of each factual situation is necessarily a discretionary decision for the circuit court, and the finding by the circuit court will not be reversed absent an abuse of discretion.

Syl. pt. 7, *Stone*, 196 W. Va. 624, 474 S.E.2d 554 (footnote added).

Furthermore, *Stone* explains that should a putative biological father have standing and paternity subsequently be determined, that does not end the inquiry. "Even if [the putative biological father] proves paternity, he still is not necessarily entitled to intrude further into the marital family (if it has survived) or into existing child-parent relationships, including any relationship that has developed between the presumed father and the child." *Stone*, 196 W. Va. at 636, 474 S.E.2d at 566. "A finding of paternity would only entitle the natural father to an opportunity to request to invoke his parental rights; in response, it would remain for the circuit court to determine issues of visitation, custody, etc., based on the best interests of the child." *Id.* (citations omitted). Moreover, we recognize that there are several steps involved in paternity establishment actions, including a determination of standing, a determination of whether to grant genetic testing, and if

---

[18] We note since *Stone* was decided, the West Virginia court system has been reorganized. In November of 2000, the voters passed a constitutional amendment to allow the West Virginia Legislature to create separate family courts. The new family courts went into effect on January 1, 2002. *See* W. Va. Code § 51-2A-1 (LexisNexis 2016); W. Va. Code § 51-2A-23 (LexisNexis 2016).

paternity is established, whether to grant visitation, custody, etc. In this regard, we previously have observed that

> it would be appropriate for the [court] to consider the impact of its [decisions in paternity establishment actions] on the existing family, if there be one, or the existence of already established parent-child relationships. If the putative father's intrusion into the family, or into an established parent-child relationship, would cause undue disruption and, thus, jeopardize the child's proper development, the court could consider that as a basis for denying relief. . . . These are all fact-specific cases, however, and require careful consideration of many issues, including the age of the child, his or her emotional maturity, the personalities of the affected individuals, their history, the wishes of the child, any prior opportunities to raise the issue of the paternity, and any other matter relevant to determining what is best for the child.

*Id.* at 636-37, 474 S.E.2d at 566-67.

The *Stone* opinion explicitly held that there could be circumstances that would justify an exception to its general two-step analysis. *See* Syl. pt. 3, *Stone*, 196 W. Va. 624, 474 S.E.2d 554. Moreover, it posited that one of those circumstances could be "cases in which the petitioner alleges and proves that he would share in the care of, responsibility for, and support of the child but for the mother's repudiation." *Id.* at 636, 474 S.E.2d at 566.

As this Court aptly discussed in *Stone*, there are various interests that come into play, including the putative biological father's interests. As we previously have acknowledged,

20

> we read our precedents as recognizing that a father has a liberty interest in maintaining an established parent-child relationship, regardless of whether the relationship is within traditional and official parameters. We do not believe the added fact that the child was born while the mother was married to another man necessarily precludes the maturation of the biological father's liberty interest. *Depending on the circumstances*, the biological father could still make the personal and emotional investments and develop the same relationship that we have found to be protected in our prior cases.

*Stone*, 196 W. Va. at 633, 474 S.E.2d at 563 (emphasis added) (footnote omitted) (internal citations omitted). Therefore, as we previously have held, an unwed father can have a constitutional liberty interest in his relationship with his child when he "demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child[.]" Syl. pt. 2, in part, *Stone*, 196 W. Va. 624, 474 S.E.2d 554. Furthermore, as we previously held, for a putative biological father to have this constitutionally protected liberty interest in a child born to a married woman who is not his wife, the putative biological father must be able to demonstrate by clear and convincing evidence that he has formed a substantial parent-child relationship with the child at issue.

However, it is clear that there are certain limited circumstances that may exist that do not allow a putative biological father the ability to form this substantial relationship with the child. In particular, there may be instances where the putative biological father is actively attempting to cultivate a substantial relationship with the child, and through no fault of his own, but rather through obstructive actions on the part of another (including the

21

child's mother), the putative biological father is unable to create the relationship generally required to obtain the liberty interest.

While not the exact context that we have in the instant matter, we have generally examined a similar issue. This Court, in *Kessel v. Leavitt*, 204 W. Va. 95, 511 S.E.2d 720 (1998), had the opportunity to consider the various rights and causes of action an unwed father may bring against an unwed mother and various other individuals. In *Kessel*, an unwed father claimed that various individuals "tortiously interfered with [his] parental rights in his son." *Kessel*, 204 W. Va. at 109, 511 S.E.2d at 734. After a jury trial in the father's favor on certain claims, the defendants appealed citing numerous errors. *Id.* One alleged error was the circuit court's instruction to the jury "that a parent has a natural right to the custody of his/her child absent a finding that the parent is unfit to have such custody." *Id.* at 172, 511 S.E.2d at 797. While this "instruction accurately reflects the law of this State, the defendants urge[d]" that this law did not apply to this case because the case relied upon "involved a situation in which the father had developed a parent-child relationship with his child, whereas [the unwed father] never established such a relationship with [the child]." *Id.* at 173, 511 S.E.2d at 798. On the other hand, the unwed father argued that his "efforts to establish a parent-child relationship with [the child] were frustrated by the defendants' concerted actions to prevent such a relationship." *Id.* Accordingly, the unwed father asserted "that because he was precluded from achieving a meaningful relationship with his son, the circuit court properly instructed the jury as to the custodial

rights he would have been entitled to assert had he been allowed by the defendants to do so." *Id.*

This Court noted that the issue presented in the case was "somewhat novel." *Id.* at 174, 511 S.E.2d at 799. We further explained that

> complicating [the] resolution of this issue [wa]s the convoluted factual scenario of this case. Despite our prior recognition of a precise standard by which an unwed biological father must fully accept and assume the parental responsibilities of raising his child in order to establish a protected custodial right to his child, *see* Syl. pt. 2, *State ex rel. Roy Allen S. v. Stone*, 196 W. Va. 624, 474 S.E.2d 554, the facts presently before us do not fit neatly into this procedural framework.

*Id.* at 175, 511 S.E.2d at 800. We stated that "[i]n order to protect his parental rights, though, an unwed biological father must demonstrate his commitment to parenting his child by participating in his/her care, rearing, and support, and by establishing a meaningful relationship with him/her." *Id.* This Court went on to reason that "[f]rom the evidence, the jury could have concluded that [the unwed father] did, in fact, take steps toward assuming these responsibilities and commencing a relationship with his son" and that his attempts to form a relationship with the child were hindered. *Id.* Accordingly, this Court found no error. *Id.* As such, the *Kessel* Court noted that despite the finding in *Stone* that an unwed putative biological father must fully accept and assume the parental responsibilities of raising his child in order to establish a protected custodial right to his child, there *may* be facts that do not necessarily fit into that framework, but nevertheless do not usurp an unwed father's ability to attempt to assert his potential parental rights.

23

Consequently, while we acknowledge that the circumstances of *Kessel* are to a degree distinguishable from the circumstances of this case,[19] it is instructive to our decision of the case *sub judice*.

Upon the facts presently before this Court, we find that a special exception as provided for under *Stone* is squarely before us. This extremely *narrow* exception exists when the putative biological father has not yet been able to form a substantial relationship with the child due to certain obstructive actions on the part of another. Consequently, we recognize that a petition by a putative biological father seeking to establish his paternity over a child who was born while the mother was married to another man satisfies the "special circumstances" exception in Syllabus point 3 of *State ex rel. Roy Allen S. v. Stone*, 196 W. Va. 624, 474 S.E.2d 554, if he is able to clearly and convincingly prove as a

---

[19] For example, we recognize that *Kessel* and the case *sub judice* involve different types of actions. *Kessel* involved a matter in circuit court asserting multiple civil claims. *Kessel v. Leavitt*, 204 W. Va. 95, 114, 511 S.E.2d 720, 739 (1998). Conversely, the instant matter is an appeal from a circuit court order affirming a family court's dismissal of a paternity establishment action. Additionally and most significantly, *Kessel* involved two unwed parents whereas this action involves an unwed father and a mother married to another man. However, as we stated in *Stone*,

> [w]e do not believe the added fact that the child was born while the mother was married to another man necessarily precludes the maturation of the biological father's liberty interest. *Depending on the circumstances*, the biological father could still make the personal and emotional investments and develop the same relationship that we have found to be protected in our prior cases.

*Stone*, 196 W. Va. at 633, 474 S.E.2d at 563 (emphasis added).

24

threshold matter that a paternal relationship had been initiated and he would have obtained a substantial paternal relationship with the child but was prevented from further development of the relationship due to the conduct of others. To achieve such standing, the putative biological father must allege and prove that he would share in the care of, responsibility for, and support of the child but for the conduct of others that prevented him from doing so. Additionally, the putative biological father must prove by clear and convincing evidence, and in accordance with *Stone*, that the child will not be harmed by allowing the paternity action to proceed. Furthermore, the putative biological father must not be dilatory in bringing the paternity establishment action; he must bring such action within a reasonable time after he knows or should know that there is a basis to believe he is the child's biological father. Finally, we reiterate that these types of matters must always be examined on a case-by-case basis with respect to the specific facts of each case.[20]

---

[20] We note that our decision today does not have any effect on our previous ruling in *Kessel*, 204 W. Va. 95, 511 S.E.2d 720, regarding the inability of one parent to charge the other parent

> with tortious interference with parental or custodial relationship if both parents have equal rights, or substantially equal rights (as in the case of a nonmarital child where the putative biological father seeks to establish a meaningful parent-child relationship with his child and, until such a relationship has been commenced, does not have rights identical to those of the child's biological mother), to establish or maintain a parental or custodial relationship with their child.

Syl. pt. 9, in part, *Kessel*, 204 W. Va. 95, 511 S.E.2d 720.

In the matter before us, it is undisputed that on three separate occasions Brandy stayed, without her husband, in Arkansas with family for several months—October of 2013 to January of 2014, February of 2015 to April of 2015, and November of 2015 to December of 2015. Brandy admits that she and Michael engaged in an intimate, sexual relationship "during time periods that make it feasible that [Michael] is the father of both subject children."

Significantly, the family court is the only court that actually heard the live testimony, took the evidence, and assessed each witness's credibility. In its dismissal order, the family court noted that it stood

> by its finding that this case justifies an exception to the [*Stone*] test. The first prong of [*Stone*] should not apply. The liberty interests of [Michael] have not been waived. However, based upon the [c]ircuit [c]ourt's rulings, the [c]ourt is left with no other choice than dismissal, based upon [Michael's] lack of standing. The [c]ourt strongly disagrees with the [c]ircuit [c]ourt.

The family court found that Michael was "prevented from carrying out his parental responsibilities by [Brandy]. [Michael] grasped the opportunity to establish a parent/child relationship with the minor child [O. M.] when he was permitted to do so by [Brandy]. [Michael] was not afforded an opportunity to establish a parent/child relationship with the minor child [E. M.]."[21] Specifically, the family court concluded that Michael "made valid

---

[21] The circuit court, in its order on appeal, noted that Michael asserted that "his attempts to exercise contact, provide support, and maintain a relationship with the

26

attempts to have a relationship with the minor child [O. M.]. His attempts were thwarted by [Brandy]. [Michael] was pervasive in his ongoing attempts. He would have acted similarly in the case of the minor child [E. M.]." The family court observed that "[i]n the case of the minor child [E. M.], no such bond exists due to the actions of [Brandy]."

Furthermore, the family court did consider several factors including the impact of its order on the existing family and whether the children would be harmed by allowing the paternity action to proceed. The family court specifically found that "[i]f permitted to proceed, [Michael's] action would not interrupt or make the Respondents' family less harmonious than it previously was, as evidenced by at least two periods of separation that occurred around the time of conception of the subject minor children." Moreover, the family court acknowledged that it "must weigh the best interests of the children against the putative father's liberty interests." The family court observed that family courts in general are "a catalyst by which new families are created every day." It

> d[id] not believe it contrary to the best interests of the minor
> children to be loved by as many caretakers as may be willing.
> A child cannot be loved too much. Though it may not be ideal
> to have another individual involv[ed] in parenting, it would not
> be disruptive to the stability of the Respondents' marriage.

In footnote 25 of *Stone* we listed certain factors that may be considered when the court conducts the two-step analysis, including but not limited to the on-going family

---

oldest child were rebuffed[.]" The circuit court further noted that Brandy denied those allegations. However, the circuit court did not make any contrary ruling or finding of fact.

27

relationship, the child's relationship with the putative biological father, and the putative biological father's attempt to become involved in the child's life. *See* 196 W. Va. at 637 n.25, 474 S.E.2d at 567 n.25. While the family court here did not examine each of the factors enumerated in footnote 25 of *Stone*, it was not required to do so. *See id*. We stated that these were only "[e]xamples of factors that may be considered when conducting this two-step analysis[.]" *Id*. We further stated that "[t]his is not an exhaustive list of factors that could be relevant. What is ultimately to be considered should be left to the discretion of the [] court." *Id*.

The family court examined the relationships between Michael and the children and found that he had attempted to cultivate a relationship with O. M. but that he was prevented from further contact and that he was prevented from any contact with E. M. The family court further found that allowing the paternity establishment action to proceed would not be harmful to the children under this set of facts.

Additionally, we do not believe that under this set of narrow and unique circumstances Michael was dilatory in initiating the paternity establishment action. He originally filed the action when the oldest child, O. M., was barely two years old and immediately following the complete cut-off of all communication between Michael and the child. Michael also amended his petition to include E. M. immediately upon learning

of the child's birth, while the child was only two months old.  Given that the children were still of such a young age, that Michael had attempted to create a relationship with O. M., that Brandy advised Michael she was not pregnant with E. M., that Michael lived several hours away in a separate state from Brandy and the children, and that he believed Brandy was going to return to him in Arkansas until September of 2016, Michael was not dilatory in bringing this action.

We emphasize that we do not take any position with respect to the fitness of Michael to share custody of, or to obtain visitation with, either O. M. or E. M.  We conclude only that Michael, under this narrow and specific set of facts, has standing to pursue his paternity action.  In accordance with our precedents, first, Michael must still prove that he is the biological father of the children.  Second,

> [e]ven if he proves paternity, he still is not necessarily entitled to intrude further into the marital family (if it has survived) or into existing child-parent relationships, including any relationship that has developed between the presumed father and the child. These factors may be considered in both the standing and paternity determinations. They also may have an impact on other issues the circuit court must decide. A finding of paternity would only entitle the natural father to an opportunity to request to invoke his parental rights; in response, it would remain for the circuit court[22] to determine issues of visitation, custody, etc., based on the best interests of the child.

---

[22] The family court would make these initial determinations in this case due to the establishment of the family court system subsequent to the *Stone* decision.  *See supra* note 18.

*Id.* at 636, 474 S.E.2d at 566 (footnote added). We reiterate that "[p]ermitting the putative father an opportunity to establish and assert his parental rights should not be construed in any way as an erosion of the child's right to continued association with the presumed father or others where a father-child relationship may have been established." *Stone*, 196 W. Va. at 636 n.24, 474 S.E.2d at 566 n.24. Moreover, similar to *Stone*,

> we do not intend, . . . to denigrate the importance of the traditional family unit or the institution of marriage. To the contrary, we continue to believe that the family provides the foundation upon which our society is built and through which its most cherished values are best transmitted. Our disposition of this case merely recognizes the reality that nontraditional living arrangements do exist, that recognized liberty interests can arise from such arrangements, and that furtherance of the State's interest in preserving family and marital stability does not require an absolute bar to the rights of putative natural fathers.

*Stone*, 196 W. Va. at 639, 474 S.E.2d at 569.

## IV.

## CONCLUSION

For the reasons set forth above, the August 9, 2018 order of the Circuit Court of Randolph County is reversed, and this case is remanded to allow the paternity establishment action to proceed in a manner consistent with this opinion. Accordingly, we remand this matter to the circuit court with directions to remand the matter to the family

30

court for further proceedings.  On remand the family court is directed to hold a hearing as to whether genetic testing is in the best interests of the children.[23]

Reversed and remanded with directions.

---

[23] *See Z.N. v. T.L.*, No. 13-0258, 2014 WL 961151, at \*4 (W. Va. Mar. 12, 2014) (memorandum decision) ("Procedurally, if standing is found under the *Stone* rule, then a preliminary determination must be made regarding whether paternity testing should be conducted, with the best interests of the child to be the preeminent deciding factor. *See* Syl. pt. 7, *Stone*, 196 W. Va. 624, 474 S.E.2d 554.").